# RENO, ATTORNEY GENERAL, ET AL. *v.* CATHOLIC SOCIAL SERVICES, INC., ET AL.

No. 91–1826.  Argued January 11, 1993—Decided June 18, 1993

44

SOUTER, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and SCALIA, KENNEDY, and THOMAS, JJ., joined. O'CONNOR, J., filed an opinion concurring in the judgment, *post*, p. 67. STEVENS, J., filed a dissenting opinion, in which WHITE and BLACKMUN, JJ., joined, *post*, p. 77.

*Ronald J. Mann* argued the cause for petitioners. With him on the briefs were *Solicitor General Starr, Assistant Attorney General Gerson, Deputy Solicitor General Mahoney*, and *Michael Jay Singer*.

*Ralph Santiago Abascal* argued the cause for respondents. With him on the brief were *Stephen A. Rosenbaum, Peter A. Schey*, and *Carlos R. Holguin.** 

JUSTICE SOUTER delivered the opinion of the Court.

This petition joins two separate suits, each challenging a different regulation issued by the Immigration and Naturalization Service (INS) in administering the alien legalization program created by Title II of the Immigration Reform and Control Act of 1986. In each instance, a District Court struck down the regulation challenged and issued a remedial order directing the INS to accept legalization applications beyond the statutory deadline; the Court of Appeals consolidated the INS's appeals from these orders, and affirmed the District Courts' judgments. We are now asked to consider whether the District Courts had jurisdiction to hear the challenges, and whether their remedial orders were permitted

---

*Briefs of *amici curiae* urging affirmance were filed for the city of Chicago et al. by *Lawrence Rosenthal, John Payton, O. Peter Sherwood, Leonard J. Koerner*, and *Stephen J. McGrath*; for the American Bar Association by *J. Michael McWilliams, Ira Kurzban, Robert A. Williams*, and *Carol L. Wolchok*; for the American Civil Liberties Union et al. by *Lucas Guttentag, Steven R. Shapiro, John A. Powell*, and *Carolyn P. Blum*; and for Church World Service et al. by *Steven L. Mayer*.

by law. We find the record insufficient to decide all jurisdictional issues and accordingly vacate and remand for new jurisdictional determinations and, if appropriate, remedial orders limited in accordance with the views expressed here.

I

On November 6, 1986, the President signed the Immigration Reform and Control Act of 1986, Pub. L. 99–603, 100 Stat. 3359, Title II of which established a scheme under which certain aliens unlawfully present in the United States could apply, first, for the status of a temporary resident and then, after a 1-year wait, for permission to reside permanently.[1] An applicant for temporary resident status must have resided continuously in the United States in an unlawful status since at least January 1, 1982, 8 U. S. C. § 1255a(a)(2)(A); must have been physically present in the United States continuously since November 6, 1986, the date the Reform Act was enacted, § 1255a(a)(3)(A); and must have been otherwise admissible as an immigrant, § 1255a(a)(4). The applicant must also have applied during the 12-month period beginning on May 5, 1987. § 1255a(a)(1).[2]

---

[1] The Immigration Reform and Control Act of 1986 amended the Immigration and Nationality Act, 66 Stat. 163, as amended, 8 U. S. C. § 1101 *et seq.* Section 201(a)(1) of the Reform Act created the alien legalization program at issue in this case by adding § 245A to the Immigration and Nationality Act, codified at 8 U. S. C. § 1255a. For the sake of convenience, we will refer to the sections of the Act as they have been codified.

[2] The Reform Act requires the 12-month period to "begi[n] on a date (not later than 180 days after November 6, 1986) designated by the Attorney General." 8 U. S. C. § 1255a(a)(1)(A). The Attorney General set the period to begin on May 5, 1987, the latest date the Reform Act authorized him to designate. See 8 CFR § 245a.2(a)(1) (1992). A separate provision of the Act requires "[a]n alien who, at any time during the first 11 months of the 12-month period . . . , is the subject of an order to show cause [why he should not be deported]" to "make application . . . not later than the end of the 30-day period beginning either on the first day of such 12-month period or on the date of the issuance of such order, whichever day is

The two separate suits joined before us challenge regulations addressing, respectively, the first two of these four requirements. The first, *Reno* v. *Catholic Social Services, Inc. (CSS), et al.*, focuses on an INS interpretation of 8 U. S. C. § 1255a(a)(3), the Reform Act's requirement that applicants for temporary residence prove "continuous physical presence" in the United States since November 6, 1986. To mitigate this requirement, the Reform Act provides that "brief, casual, and innocent absences from the United States" will not break the required continuity. § 1255a(a)(3)(B). In a telex sent to its regional offices on November 14, 1986, however, the INS treated the exception narrowly, stating that it would consider an absence "brief, casual, and innocent" only if the alien had obtained INS permission, known as "advance parole," before leaving the United States; aliens who left without it would be "ineligible for legalization." App. 186. The INS later softened this limitation somewhat by regulations issued on May 1, 1987, forgiving a failure to get advance parole for absences between November 6, 1986, and May 1, 1987. But the later regulation confirmed that any absences without advance parole on or after May 1, 1987, would not be considered "brief, casual, and innocent" and would therefore be taken to have broken the required continuity. See 8 CFR § 245a.1(g) (1992) ("Brief, casual, and innocent means a departure authorized by [the INS] (advance parole) subsequent to May 1, 1987 of not more than thirty (30) days for legitimate emergency or humanitarian purposes").

The *CSS* plaintiffs challenged the advance parole regulation as an impermissible construction of the Reform Act. After certifying the case as a class action, the District Court eventually defined a class comprising "persons prima facie eligible for legalization under [8 U. S. C. § 1255a] who de-

later." § 1255a(a)(1)(B); see § 1255a(e)(1) (providing further relief for certain aliens "apprehended before the beginning of the application period").

48

parted and reentered the United States without INS authorization (i. e. 'advance parole') after the enactment of the [Reform Act] following what they assert to have been a brief, casual and innocent absence from the United States."[3]   No. Civ. S–86–1343 LKK (ED Cal., May 3, 1988) (App. 50).   On April 22, 1988, 12 days before the end of the legalization program's 12-month application period, the District Court granted partial summary judgment invalidating the regulation and declaring that "brief, casual, and innocent" absences did not require prior INS approval.   No. Civ. S–86–1343 LKK (ED Cal., Apr. 22, 1988) (Record, Doc. No. 161); see *Catholic Social Services, Inc.* v. *Meese*, 685 F. Supp. 1149 (ED Cal. 1988) (explaining the basis of the April 22 order). No appeal was taken by the INS (by which initials we will refer to the Immigration and Naturalization Service and the Attorney General collectively), and after further briefing on remedial issues the District Court issued an order on June 10, 1988, requiring the INS to extend the application period to November 30, 1988[4] for class members who "knew of [the INS's] unlawful regulation and thereby concluded that they

---

[3] The *CSS* lawsuit originally challenged various aspects of the INS's administration of both the legalization program created by Title II of the Reform Act and the "Special Agricultural Workers" (SAW) legalization program created by Part A of Title III of the Reform Act (codified at 8 U. S. C. § 1160).   The challenge to the SAW program eventually took its own procedural course, and was resolved by a district court order that neither party appealed.   No. Civ. S–86–1343 LKK (ED Cal., Aug. 11, 1988) (App. 3, Record, Doc. No. 188).   With respect to the Title II challenge, the District Court originally certified a broad class comprising all persons believed by the Government to be deportable aliens who could establish a prima facie claim for adjustment of status to temporary resident under 8 U. S. C. § 1255a.   No. Civ. S–86–1343 LKK (ED Cal., Nov. 24, 1986) (App. 15).   After further proceedings, the District Court narrowed the class definition to that set out in the text.

[4] The District Court chose November 30, 1988, to coincide with the deadline for legalization applications under the Reform Act's SAW program. See No. Civ. S–86–1343 LKK (ED Cal., June 10, 1988) (App. to Pet. for Cert. 22a).

were ineligible for legalization and by reason of that conclusion did not file an application."[5]  No. Civ. S–86–1343 LKK (ED Cal., June 10, 1988) (App. to Pet. for Cert. 25a).  Two further remedial orders issued on August 11, 1988, provided, respectively, an alternative remedy if the extension of the application period should be invalidated on appeal, and further specific relief for any class members who had been detained or apprehended by the INS or who were in deportation proceedings.[6]  No. Civ. S–86–1343 LKK (ED Cal.) (Record, Doc. Nos. 187, 189).  The INS appealed all three of the remedial orders.[7]

The second of the two lawsuits, styled *INS* v. *League of United Latin American Citizens (LULAC) et al.*, goes to the INS's interpretation of 8 U. S. C. § 1255a(a)(2)(A), the Reform Act's "continuous unlawful residence" requirement. The Act provides that certain brief trips abroad will not break an alien's continuous unlawful residence (just as

---

[5] The order also required the INS to identify all class members whose applications had been denied or recommended for denial on the basis of the advance parole regulation, and to "rescind such denials . . . and readjudicate such applications in a manner consistent with the court's order." No. Civ. S–86–1343 LKK (ED Cal., June 10, 1988) (App. to Pet. for Cert. 24a).  The INS did not appeal this part of the order.  See Brief for Petitioners 11, n. 11.

[6] The latter order required the INS to provide apprehended and detained aliens, and those in deportation proceedings, with "a reasonable opportunity, of not less than thirty (30) days, to submit an application [for legalization]."  See n. 2, *supra* (describing the Act's provisions regarding such aliens); n. 12, *infra* (describing the *LULAC* court's relief for such aliens in *INS* v. *League of United Latin American Citizens*).

[7] The *CSS* plaintiffs cross-appealed, challenging the District Court's denial of their request for an injunction ordering the INS to permit class members outside the United States to enter the United States so that they could file applications for adjustment of status.  The Court of Appeals affirmed the District Court's denial, see *Catholic Social Services, Inc.* v. *Thornburgh*, 956 F. 2d 914, 923 (CA9 1992), and the plaintiffs did not petition this Court for review of the Court of Appeals' judgment; thus, the issues presented by the cross-appeal are not before us.

certain brief absences from the United States would not violate the "continuous physical presence" requirement). See § 1255a(g)(2)(A). Under an INS regulation, however, an alien would fail the "continuous unlawful residence" requirement if he had gone abroad and reentered the United States by presenting "facially valid" documentation to immigration authorities. 8 CFR § 245a.2(b)(8) (1992).[8] On the INS's reasoning, an alien's use of such documentation made his subsequent presence "lawful" for purposes of § 1255a(a)(2)(A), thereby breaking the continuity of his unlawful residence. Thus, an alien who had originally entered the United States under a valid nonimmigrant visa, but had become an unlawful resident by violating the terms of that visa in a way known to the Government before January 1, 1982, was eligible for relief under the Reform Act. If, however, the same alien left the United States briefly and then used the same visa to get back in (a facially valid visa that had in fact become invalid after his earlier violation of its terms), he rendered himself ineligible.

In July 1987, the *LULAC* plaintiffs brought suit challenging the reentry regulation as inconsistent both with the Act and the equal protection limitation derived from Fifth Amendment due process. With this suit still pending, on November 17, 1987, some seven months into the Reform

---

[8] This regulation expresses the INS policy in signally cryptic form, stating that an alien's eligibility "shall not be affected by entries to the United States subsequent to January 1, 1982 that were not documented on Service Form I–94, Arrival-Departure Record." By negative implication, an alien *would* be rendered ineligible by an entry that *was* documented on an I–94 form. An entry is documented on an I–94 form when it occurs through a normal, official port of entry, at which an alien must present some valid-looking document (for example, a nonimmigrant visa) to get into the United States. See 8 CFR § 235.1(f) (1992). Under the INS policy, an alien who reentered by presenting such a "facially valid" document broke the continuity of his unlawful residence, whereas an alien who reentered the United States by crossing a desolate portion of the border, thus avoiding inspection altogether, maintained that continuity.

Act's 12-month application period, the INS modified its re-entry policy by issuing two new regulations.[9]   The first, codified at 8 CFR § 245a.2(b)(9) (1992), specifically acknowl-edged the eligibility of an alien who "reentered the United States as a nonimmigrant . . . in order to return to an unrelin-quished unlawful residence," so long as he "would be other-wise eligible for legalization and . . . was present in the United States in an unlawful status prior to January 1, 1982." 52 Fed. Reg. 43845 (1987).   The second, codified at 8 CFR § 245a.2(b)(10) (1992), qualified this expansion of eligibility by obliging such an alien to obtain a waiver of a statutory pro-vision requiring exclusion of aliens who enter the United States by fraud.   *Ibid.*

Although the *LULAC* plaintiffs then amended their com-plaint, they pressed their claim that 8 CFR § 245a.2(b)(8) (1992), the reentry regulation originally challenged, had been invalid prior to its modification.   As to that claim, the Dis-trict Court certified the case as a class action, with a class including

> "all persons who qualify for legalization but who were deemed ineligible for legalization under the original [reentry] policy, who learned of their ineligibility follow-ing promulgation of the policy and who, relying upon information that they were ineligible, did not apply for legalization before the May 4, 1988 deadline."[10]   No. 87–4757–WDK (JRx) (CD Cal., July 15, 1988) (App. 216).

---

[9] The INS first announced its intention to modify its policy in a state-ment issued by then-INS Commissioner Alan Nelson on October 8, 1987, see Record, Addendum to Doc. No. 8; however, it did not issue the new regulations until November 17 following.

[10] The *LULAC* plaintiffs also challenged the modified policy, claiming that aliens should not have to comply with the requirement of 8 CFR § 245a.2(b)(10) (1992) to obtain a waiver of excludability for having fraudu-lently procured entry into the United States.   With respect to this chal-lenge, the District Court certified a second class comprising persons ad-versely affected by the modified policy.   See No. 87–4757–WDK (JRx) (CD Cal., July 15, 1988) (App. 216).   However, the District Court ultimately

On July 15, 1988, 10 weeks after the end of the 12-month application period, the District Court held the regulation invalid, while reserving the question of remedy. *Ibid.* (App. 224–225). Again, the INS took no appeal. The *LULAC* plaintiffs then sought a remedial order extending the application period for class members to November 30, 1988,[11] and compelling the INS to publicize the modified policy and the extended application period. They argued that the INS had effectively truncated the 12-month application period by enforcing the invalid regulation, by publicizing the regulation so as to dissuade potential applicants, and by failing to give sufficient publicity to its change in policy. On August 12, 1988, the District Court granted the plaintiffs' request for injunctive relief.[12] No. 87–4757–WDK (JRx) (CD Cal., Aug. 12, 1988) (App. to Pet. for Cert. 50a). The INS appealed this remedial order.

In its appeals in both *CSS* and *LULAC,* the INS raised two challenges to the orders of the respective District Courts. First, it argued that the restrictive judicial review provisions of the Reform Act barred district court jurisdiction over the claim in each case. It contended, second, that each District Court erred in ordering an extension of the 12-month application period, the 12-month limit being, it maintained, a substantive statutory restriction on relief beyond the power of a court to alter.

---

rejected the challenge to the modified policy, see *ibid.* (App. 234), and the *LULAC* plaintiffs did not appeal the grant of summary judgment to the INS on this issue.

[11] As in the *CSS* case, this date was chosen to coincide with the deadline for legalization applications under the Reform Act's SAW program. No. 87–4757–WDK (JRx) (CD Cal., Aug. 12, 1988) (App. to Pet. for Cert. 50a); see n. 5, *supra.*

[12] The order also required the INS to give those illegal aliens apprehended by INS enforcement officials "adequate time" to apply for legalization. App. to Pet. for Cert. 60a; see n. 2, *supra* (describing the Act's provisions regarding such aliens); n. 6, *supra* (describing the *CSS* court's relief for such aliens).

The Ninth Circuit eventually consolidated the two appeals. After holding them pending this Court's disposition of *McNary* v. *Haitian Refugee Center, Inc.*, 498 U. S. 479 (1991), it rendered a decision in February 1992, affirming the District Courts.[13] *Catholic Social Services, Inc.* v. *Thornburgh*, 956 F. 2d 914 (1992). We were prompted to grant certiorari, 505 U. S. 1203 (1992), by the importance of the issues, and by a conflict between Circuits on the jurisdictional issue, see *Ayuda, Inc.* v. *Thornburgh*, 292 U. S. App. D. C. 150, 156–162, 948 F. 2d 742, 748–754 (1991) (holding that the Reform Act precluded district court jurisdiction over a claim that INS regulations were inconsistent with the Act), cert. pending, No. 91–1924. We now vacate and remand.

## II

The Reform Act not only sets the qualifications for obtaining temporary resident status, but also provides an exclusive scheme for administrative and judicial review of "determination[s] respecting . . . application[s] for adjustment of status" under the Title II legalization program. 8 U. S. C. § 1255a(f)(1). Section 1255a(f)(3)(A) directs the Attorney General to "establish an appellate authority to provide for a single level of administrative appellate review" of such deter-

---

[13] While the appeals were pending in the Ninth Circuit, the orders of the District Courts were each subject to a stay order. Under the terms of each stay order, the INS was obliged to grant a stay of deportation and temporary work authorization to any class member whose application made a prima facie showing of eligibility for legalization, but was not obliged to process the applications. See App. to Pet. for Cert. 63a–64a. Because the Court of Appeals has stayed its mandate pending this Court's disposition of the case, see Nos. 88–15046, 88–15127, 88–15128, 88–6447 (CA9, May 1, 1992) (staying the mandate); Nos. 88–15046, 88–15127, 88–15128, 88–6447 (CA9, Sept. 17, 1992) (denying the INS's motion to dissolve the stay and issue its mandate), the INS is still operating under these stay orders. By March 1992, it had received some 300,000 applications for temporary resident status under the stay orders. See App. to Pet. for Cert. 83a.

minations. Section 1255a(f)(4)(A) provides that a denial of adjustment of status is subject to review by a court "only in the judicial review of an order of deportation under [8 U. S. C. § 1105a]"; under § 1105a, this review takes place in the courts of appeals. Section 1255a(f)(1) closes the circle by explicitly rendering the scheme exclusive: "There shall be no administrative or judicial review of a determination respecting an application for adjustment of status under this section except in accordance with this subsection."

Under this scheme, an alien denied adjustment of status by the INS in the first instance may appeal to the Associate Commissioner for Examinations, the "appellate authority" designated by the Attorney General pursuant to § 1255a(f)(3)(A). See 8 CFR §§ 103.1(f)(1)(xxvii), 245a.2(p) (1992). Although the Associate Commissioner's decision is the final agency action on the application, an adverse decision does not trigger deportation proceedings. On the contrary, because the Reform Act generally allows the INS to use information in a legalization application only to make a determination on the application, see 8 U. S. C. § 1255a(c)(5),[14] an alien whose appeal has been rejected by the Associate Commissioner stands (except for a latent right to judicial review of that rejection) in the same position he did before he applied: he is residing in the United States in an unlawful status, but the Government has not found out about him yet.[15]

---

[14] The INS may also use the information to enforce a provision penalizing the filing of fraudulent applications, and to prepare statistical reports to Congress. § 1255a(c)(5)(A).

[15] This description excludes the alien who was already in deportation proceedings before he applied for legalization under § 1255a. Once his application is denied, however, such an alien must also continue with deportation proceedings as if he had never applied, and may obtain further review of the denial of his application only upon review of a final order of deportation entered against him. See 8 U. S. C. § 1255a(f)(4)(A). The Act's provisions regarding aliens who have been issued an order to show cause before applying are described at n. 2, *supra;* the provisions of the

We call the right to judicial review "latent" because § 1255a(f)(4)(A) allows judicial review of a denial of adjustment of status only on appeal of "an order of deportation." Hence, the alien must first either surrender to the INS for deportation [16] or wait for the INS to catch him and commence a deportation proceeding, and then suffer a final adverse decision in that proceeding, before having an opportunity to challenge the INS's denial of his application in court.

The INS takes these provisions to preclude the District Courts from exercising jurisdiction over the claims in both the *CSS* and *LULAC* cases, reasoning that the regulations it adopted to elaborate the qualifications for temporary resident status are "determination[s] respecting an application for adjustment of status" within the meaning of § 1255a(f)(1); because the claims in *CSS* and *LULAC* attack the validity of those regulations, they are subject to the limitations contained in § 1255a(f), foreclosing all jurisdiction in the district courts, and granting it to the courts of appeals only on review of a deportation order. The INS recognizes, however, that this reasoning is out of line with our decision in *McNary v. Haitian Refugee Center, Inc., supra,* where we construed a virtually identical set of provisions governing judicial review within a separate legalization program for agricultural workers created by Title III of the Reform Act.[17] There, as

District Court orders regarding such aliens are described at nn. 6 and 12, *supra.*

[16] Although aliens have no explicit statutory right to force the INS to commence a deportation proceeding, the INS has represented that "any alien who wishes to challenge an adverse determination on his legalization application may secure review by surrendering for deportation at any INS district office." Reply Brief for Petitioners 9–10 (footnote omitted).

[17] The single difference between the two sets of provisions is the addition, in the provisions now before us, of a further specific jurisdictional bar: "No denial of adjustment of status under this section based on a late filing of an application for such adjustment may be reviewed by a court of the United States or of any State or reviewed in any administrative pro-

here, the critical language was "a determination respecting an application for adjustment of status." We said that "the reference to 'a determination' describes a single act rather than a group of decisions or a practice or procedure employed in making decisions." *Id.*, at 492. We noted that the provision permitting judicial review only in the context of a deportation proceeding also defined its scope by reference to a single act: "'judicial review of *such a denial.*'" *Ibid.* (emphasis in original) (quoting 8 U. S. C. § 1160(e)(3)); see § 1255a(f)(4)(A) (using identical language). We therefore decided that the language setting the limits of the jurisdictional bar "describes the denial of an individual application," 498 U. S., at 492, and thus "applies only to review of denials of individual . . . applications." *Id.*, at 494. The INS gives us no reason to reverse course, and we reject its argument that § 1255a(f)(1) precludes district court jurisdiction over an action challenging the legality of a regulation without referring to or relying on the denial of any individual application.

Section 1255a(f)(1), however, is not the only jurisdictional hurdle in the way of the *CSS* and *LULAC* plaintiffs, whose claims still must satisfy the jurisdictional and justiciability requirements that apply in the absence of a specific congressional directive. To be sure, a statutory source of jurisdiction is not lacking, since 28 U. S. C. § 1331, generally granting federal-question jurisdiction, "confer[s] jurisdiction on federal courts to review agency action." *Califano* v. *Sanders*, 430 U. S. 99, 105 (1977). Neither is it fatal that the Reform Act is silent about the type of judicial review those plaintiffs seek. We customarily refuse to treat such silence "as a denial of authority to [an] aggrieved person to seek appropriate relief in the federal courts," *Stark* v. *Wickard*, 321 U. S. 288, 309 (1944), and this custom has been "reinforced by the enactment of the Administrative Procedure Act, which embod-

---

ceeding of the United States Government." 8 U. S. C. § 1255a(f)(2). As the INS appears to concede, see Brief for Petitioners 19, the claims at issue in this case do not fall within the scope of this bar.

ies the basic presumption of judicial review to one 'suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute.'" *Abbott Laboratories* v. *Gardner,* 387 U. S. 136, 140 (1967) (quoting 5 U. S. C. § 702).

As we said in *Abbott Laboratories,* however, the presumption of available judicial review is subject to an implicit limitation: "injunctive and declaratory judgment remedies," what the respondents seek here, "are discretionary, and courts traditionally have been reluctant to apply them to administrative determinations unless these arise in the context of a controversy 'ripe' for judicial resolution,"[18] 387 U. S., at 148, that is to say, unless the effects of the administrative action challenged have been "felt in a concrete way by the challenging parties," *id.,* at 148–149. In some cases, the promulgation of a regulation will itself affect parties concretely enough to satisfy this requirement, as it did in *Abbott Laboratories* itself. There, for example, as well as in *Gardner* v. *Toilet Goods Assn., Inc.,* 387 U. S. 167 (1967), the promulgation of the challenged regulations presented plaintiffs with the immediate dilemma to choose between complying with newly imposed, disadvantageous restrictions and risking serious penalties for violation. *Abbott Laboratories, supra,* at 152–153; *Gardner, supra,* at 171–172. But that will not be so in every case. In *Toilet Goods Assn., Inc.* v. *Gardner,* 387 U. S. 158 (1967), for example, we held that a chal-

---

[18] We have noted that ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction. See, *e. g., Buckley* v. *Valeo,* 424 U. S. 1, 114 (1976) *(per curiam); Socialist Labor Party* v. *Gilligan,* 406 U. S. 583, 588 (1972). Even when a ripeness question in a particular case is prudential, we may raise it on our own motion, and "cannot be bound by the wishes of the parties." *Regional Rail Reorganization Act Cases,* 419 U. S. 102, 138 (1974). Although the issue of ripeness is not explicitly addressed in the questions presented in the INS's petition, it is fairly included and both parties have touched on it in their briefs before this Court. See Brief for Petitioners 20; Brief for Respondents 17, n. 23.

lenge to another regulation, the impact of which could not "be said to be felt immediately by those subject to it in conducting their day-to-day affairs," *id.*, at 164, would not be ripe before the regulation's application to the plaintiffs in some more acute fashion, since "no irremediabl[y] adverse consequences flow[ed] from requiring a later challenge," *ibid.* See *Lujan* v. *National Wildlife Federation,* 497 U. S. 871, 891 (1990) (a controversy concerning a regulation is not ordinarily ripe for review under the Administrative Procedure Act until the regulation has been applied to the claimant's situation by some concrete action).

The regulations challenged here fall on the latter side of the line. They impose no penalties for violating any newly imposed restriction, but limit access to a benefit created by the Reform Act but not automatically bestowed on eligible aliens. Rather, the Act requires each alien desiring the benefit to take further affirmative steps, and to satisfy criteria beyond those addressed by the disputed regulations.[19] It

---

[19] JUSTICE O'CONNOR contends that "if the court can make a firm prediction that the plaintiff will apply for the benefit, and that the agency will deny the application by virtue of the [challenged] rule[,] then there may well be a justiciable controversy that the court may find prudent to resolve." *Post,* at 69. Even if this is true, however, we do not see how such a "firm prediction" could be made in this case. As for the prediction that the plaintiffs "will apply for the benefit," we are now considering only the cases of those plaintiffs who, in fact, failed to file timely applications. As for the prediction that "the agency will deny the application by virtue of the [challenged] rule," we reemphasize that in this case, access to the benefit in question is conditioned on several nontrivial rules other than the two challenged. This circumstance makes it much more difficult to predict firmly that the INS would deny a particular application "by virtue of the [challenged] rule," and not by virtue of some other, unchallenged rule that it determined barred an adjustment of status.

Similarly distinguishable is our decision in *Northeastern Fla. Chapter, Associated Gen. Contractors of America* v. *Jacksonville,* 508 U. S. 656 (1993), the factual and legal setting of which JUSTICE STEVENS appears to equate with that of the present cases, see *post,* at 81–82. In *Associated General Contractors,* the plaintiff association alleged that "many of its members regularly bid on and perform construction work for the [defendant city]," 508 U. S., at 659 (internal quotation marks omitted), thus pro-

delegates to the INS the task of determining on a case-by-case basis whether each applicant has met all of the Act's conditions, not merely those interpreted by the regulations in question. In these circumstances, the promulgation of the challenged regulations did not itself give each *CSS* and *LULAC* class member a ripe claim; a class member's claim would ripen only once he took the affirmative steps that he could take before the INS blocked his path by applying the regulation to him.[20]

---

viding a historical basis for the further unchallenged allegation that the members "would have . . . bid on . . . designated set aside contracts but for the restrictions imposed by the [challenged] ordinance," *ibid.* (internal quotation marks omitted). A plaintiff in these cases can point to no similar history of application behavior to support a claim that "she would have applied . . . but for the invalid regulations," *post,* at 85; and we think the mere fact that she may have heard of the invalid regulations through a Qualified Designated Entity, a private attorney, or "word of mouth," *post,* at 80, insufficient proof of this counterfactual. Further, we defined the "injury in fact" in *Associated General Contractors* as "the inability to compete on an equal footing in the bidding process, not the loss of a contract," 508 U. S., at 666; thus, whether the association's members would have been awarded contracts but for the challenged ordinance was not immediately relevant. Here, the plaintiffs seek, not an equal opportunity to compete for adjustments of status, but the adjustments of status themselves. Under this circumstance, it becomes important to know whether they would be eligible for the adjustments but for the challenged regulations.

[20] JUSTICE O'CONNOR maintains that the plaintiffs' actions are now ripe because they have amended their complaints to seek the additional remedy of extending the application period, and the application period is now over. *Post,* at 71–72. We do not see how these facts establish ripeness. In both cases before us, the plaintiffs' underlying claim is that an INS regulation implementing the Reform Act is invalid. Because the Act requires each alien desiring legalization to take certain affirmative steps, and because the Act's conditions extend beyond those addressed by the challenged regulations, one cannot know whether the challenged regulation actually makes a concrete difference to a particular alien until one knows that he will take those affirmative steps and will satisfy the other conditions. Neither the fact that the application period is now over, nor the fact that the plaintiffs would now like the period to be extended, tells us anything about the willingness of the class members to take the required

Ordinarily, of course, that barrier would appear when the INS formally denied the alien's application on the ground that the regulation rendered him ineligible for legalization. A plaintiff who sought to rely on the denial of his application to satisfy the ripeness requirement, however, would then still find himself at least temporarily barred by the Reform Act's exclusive review provisions, since he would be seeking "judicial review of a determination respecting an application." 8 U. S. C. § 1255a(f)(1). The ripeness doctrine and the Reform Act's jurisdictional provisions would thus dovetail neatly, and not necessarily by mere coincidence. Congress may well have assumed that, in the ordinary case, the courts would not hear a challenge to regulations specifying limits to eligibility before those regulations were actually applied to an individual, whose challenge to the denial of an individual application would proceed within the Reform Act's limited scheme. The *CSS* and *LULAC* plaintiffs do not

---

affirmative steps, or about their satisfaction of the Reform Act's other conditions. The end of the application period may mean that the plaintiffs no longer have an opportunity to take the steps that could make their claims ripe; but this fact is significant only for those plaintiffs who can claim that the Government prevented them from filing a timely application. See *infra*, at 61–64 (discussing the INS's "front-desking" practice).

JUSTICE O'CONNOR's ripeness analysis encounters one further difficulty. In her view, the plaintiffs' claims are ripe because "[i]t is *certain* that an alien who now applies to the INS for legalization will be denied that benefit because the period has closed." *Post*, at 72 (emphasis in original). In these circumstances, she suggests, it would make no sense to require "the would-be beneficiary [to] make the wholly futile gesture of submitting an application." *Ibid.* But a plaintiff who, to establish ripeness, relies on the certainty that his application would be denied on grounds of untimeliness, must confront § 1255a(f)(2), which flatly bars all "court[s] of the United States" from reviewing "denial[s] of adjustment of status . . . based on a late filing of an application for such adjustment." We would almost certainly interpret this provision to bar such reliance, since otherwise plaintiffs could always entangle the INS in litigation over application timing claims simply by suing without filing an application, a result we believe § 1255a(f)(2) was intended to foreclose in the ordinary case.

argue that this limited scheme would afford them inadequate review of a determination based on the regulations they challenge, presumably because they would be able to obtain such review on appeal from a deportation order, if they become subject to such an order; their situation is thus different from that of the "17 unsuccessful individual SAW applicants" in *McNary*, 498 U. S., at 487, whose procedural objections, we concluded, could receive no practical judicial review within the scheme established by 8 U. S. C. § 1160(e), *id.*, at 496–497.

This is not the end of the matter, however, because the plaintiffs have called our attention to an INS policy that may well have placed some of them outside the scope of § 1255a(f)(1). The INS has issued a manual detailing procedures for its offices to follow in implementing the Reform Act's legalization programs and instructing INS employees called "Legalization Assistants" to review certain applications in the presence of the applicants before accepting them for filing. See Procedures Manual for the Legalization and Special Agricultural Worker Programs of the Immigration Reform and Control Act of 1986 (Legalization Manual or Manual).[21] According to the Manual, "[m]inor correctable deficiencies such as incomplete responses or typographical errors may be corrected by the [Legalization Assistant]." *Id.*, at IV–6. "[I]f the applicant is statutorily ineligible," however, the Manual provides that "the application *will be rejected* by the [Legalization Assistant]." *Ibid.* (emphasis added). Because this prefiling rejection of applications oc-

---

[21] Under the Manual's procedures, only those applications that were not prepared with the assistance of a "Qualified Designated Entity" (the Reform Act's designation for private organizations that serve as intermediaries between applicants and the INS, see 8 U. S. C. § 1255a(c)(1)) are subject to review by Legalization Assistants. The applications that were prepared with the help of Qualified Designated Entities skip this step. See Legalization Manual, at IV–5, IV–6. There is no evidence in the record indicating how many *CSS* and *LULAC* class members were assisted by Qualified Designated Entities in preparing their applications.

curs at the front desk of an INS office, it has come to be called "front-desking."[22] While the regulations challenged in *CSS* and *LULAC* were in force, Legalization Assistants who applied both the regulations and the Manual's instructions may well have "front-desked" the applications of class members who disclosed the circumstances of their trips outside the United States, and affidavits on file in the *LULAC* case represent that they did exactly that.[23] See n. 26, *infra*.

---

[22] The INS forwards a different interpretation of the policy set forth in the Legalization Manual. According to the INS, the Manual reflects a policy, motivated by "charitable concern," of "inform[ing] aliens of [the INS's] view that their applications are deficient before it accepts the filing fee, so that they can make an informed choice about whether to pay the fee if they are not going to receive immediate relief." Reply Brief for Petitioners 9 (emphasis omitted). The "rejection" policy, argues the INS, did not really bar applicants from filing applications; another sentence in the Manual proves that the door remains open, for it provides that "[i]f an applicant whose application has been rejected by the [Legalization Assistant] insists on filing, the application will be routed through a fee clerk to an adjudicator with a routing slip from the [Legalization Assistant] stating the noted deficiency(ies)." Legalization Manual, at IV–6.

We cannot find, in either of the two sentences the parties point to, the policy now articulated by the INS. The first sentence does not say that applicants will be informed; it says that applications will be rejected. The second sentence contains no hint that the Legalization Assistant should tell the applicant that he has a right to file an application despite the "rejection," or that he should file an application if he wants to preserve his rights. Rather, it seems to provide little more than a procedure for dealing with the pesky applicant who "won't take 'no' for an answer." Neither of the sentences preserves a realistic path to judicial review.

[23] In its reply brief in this Court, see Reply Brief for Petitioners 14, the INS argues that those individuals who were front-desked fall outside the classes defined by the District Courts, since the *CSS* class included only those who "knew of [INS's] unlawful regulation and thereby concluded that they were ineligible for legalization and by reason of that conclusion did not file an application," App. to Pet. for Cert. 25a, and the *LULAC* class included only those "who learned of their ineligibility following promulgation of the policy and who, relying upon information that they were ineligible, did not apply for legalization before the May 4, 1988 deadline," App. 216. The language in *CSS* that the INS points to, however, is not

As respondents argue, see Brief for Respondents 17, n. 23, a class member whose application was "front-desked" would have felt the effects of the "advance parole" or "facially valid document" regulation in a particularly concrete manner, for his application for legalization would have been blocked then and there; his challenge to the regulation should not fail for lack of ripeness. Front-desking would also have a further, and untoward, consequence for jurisdictional purposes, for it would effectively exclude an applicant from access even to the limited administrative and judicial review procedures established by the Reform Act. He would have no formal denial to appeal to the Associate Commissioner for Examinations, nor would he have an opportunity to build an administrative record on which judicial review might be based.[24] Hence, to construe § 1255a(f)(1) to bar district court jurisdiction over his challenge, we would have to impute to Congress an intent to preclude judicial review of the legality of INS action entirely under those circumstances. As we stated recently in *McNary*, however, there is a "well-

the class definition, which is much broader, see *supra*, at 48–49; rather, it is part of the requirements class members must meet to obtain one of the forms of relief ordered by the District Court. We understand the *LULAC* class definition to use the word "apply" to mean "have an application accepted for filing by the INS," as under this reading the definition encompasses all those whom the INS refuses to treat as having timely applied (which is the refusal that lies at the heart of the parties' dispute), and as the definition then includes those who "learned of their ineligibility" by being front-desked, since it would be odd to exclude those who learned of their ineligibility in the most direct way possible from this description. As we note below, however, see n. 29, *infra*, we believe that the word "applied" as used in § 1255a(a)(1)(A) has a broader meaning than that given to the word in the *LULAC* class definition.

[24] The Reform Act limits judicial review to "the administrative record established at the time of the review by the appellate authority." 8 U. S. C. § 1255a(f)(4)(B). In addition, an INS regulation provides that a legalization application may not "be filed or reopened before an immigration judge or the Board of Immigration Appeals during exclusion or deportation proceedings." 8 CFR § 103.3(a)(3)(iii) (1992).

settled presumption favoring interpretations of statutes that allow judicial review of administrative action," 498 U. S., at 496; and we will accordingly find an intent to preclude such review only if presented with "'clear and convincing evidence,'" *Abbott Laboratories*, 387 U. S., at 141 (quoting *Rusk* v. *Cort*, 369 U. S. 367, 379–380 (1962)). See generally *Bowen* v. *Michigan Academy of Family Physicians*, 476 U. S. 667, 670–673 (1986) (discussing the presumption in favor of judicial review).

There is no such clear and convincing evidence in the statute before us. Although the phrase "a determination respecting an application for adjustment of status" could conceivably encompass a Legalization Assistant's refusal to accept the application for filing at the front desk of a Legalization Office, nothing in the statute suggests, let alone demonstrates, that Congress was using "determination" in such an extended and informal sense. Indeed, at least one related statutory provision suggests just the opposite. Section 1255a(f)(3)(B) limits administrative appellate review to "the administrative record established at the time of the determination on the application"; because there obviously can be no administrative record in the case of a front-desked application, the term "determination" is best read to exclude front-desking. Thus, just as we avoided an interpretation of 8 U. S. C. § 1160(e) in *McNary* that would have amounted to "the practical equivalent of a total denial of judicial review of generic constitutional and statutory claims," *McNary, supra*, at 497, so here we avoid an interpretation of § 1255a(f)(1) that would bar front-desked applicants from ever obtaining judicial review of the regulations that rendered them ineligible for legalization.

Unfortunately, however, neither the *CSS* record nor the *LULAC* record contains evidence that particular class members were actually subjected to front-desking. None of the named individual plaintiffs in either case alleges that he or

she was front-desked,[25] and while a number of affidavits in the *LULAC* record contain the testimony of immigration attorneys and employees of interested organizations that the INS has "refused," "rejected," or "den[ied] individuals the right to file" applications,[26] the testimony is limited to such general assertions; none of the affiants refers to any specific incident that we can identify as an instance of front-desking.[27]

---

[25] In *LULAC*, the one named individual plaintiff who represents the subclass challenging the INS's original "facially-valid document" policy never attempted to file an application, because he was advised by an attorney over the telephone that he was ineligible. See *LULAC*, First Amended Complaint 11–12 (Record, Doc. No. 56) (describing plaintiff John Doe). In *CSS*, none of the named plaintiffs challenging the "advance parole" regulation allege that they attempted to file applications. See *CSS* Sixth Amended Complaint 12–18 (Record, Doc. No. 140).

[26] See App. 204 (affidavit of Pilar Cuen) (legalization counselor states that "INS has refused applications for legalization because our clients entered after January 1, 1982 with a non-immigrant visa and an I–94 was issued at the time of reentry"); App. 209 (affidavit of Joanne T. Stark) (immigration lawyer in private practice states that she is "aware that the Service has discouraged application in the past by [*LULAC* class members] or has rejected applications made"); Record, Doc. No. 16, Exh. H, p. 135 (affidavit of Isabel Garcia Gallegos) (immigration attorney states that "the legalization offices in Southern Arizona [have] rejected, and otherwise, discouraged individuals who had, in fact entered the United States with an I–94 after January 1, 1982"); App. 200 (affidavit of Marc Van Der Hout) (immigration attorney states that "[i]t has been the practice of the San Francisco District legalization office to deny individuals the right to file an application for legalization under the [Reform Act] if the individual had been in unlawful status prior to January 1, 1982, departed the United States post January 1, 1982, and re-entered on a non-immigrant visa").

[27] Only one affiant refers to a specific incident. He recounts: "[I]n August [1987] I was at the San Francisco legalization office when an individual came in seeking to apply for legalization. She was met at the reception desk by a clerk and when she explained the facts of her case, [that she had departed and re-entered the United States after January 1, 1982, on a non-immigrant visa], she was told that she did not qualify for legalization and could not file." App. 200–201 (affidavit of Marc Van Der Hout). The significance of this incident is unclear, however, since there is no way

This lack of evidence precludes us from resolving the jurisdictional issue here, because, on the facts before us, the front-desking of a particular class member is not only sufficient to make his legal claims ripe, but necessary to do so. As the case has been presented to us, there seems to be no reliable way of determining whether a particular class member, had he applied at all (which, we assume, he did not), would have applied in a manner that would have subjected him to front-desking. As of October 16, 1987, the INS had certified 977 Qualified Designated Entities which could have aided class members in preparing applications that would not have been front-desked, see 52 Fed. Reg. 44812 (1987); n. 21, *supra*, and there is no prior history of application behavior on the basis of which we could predict who would have applied without Qualified Designated Entity assistance and therefore been front-desked. Hence, we cannot say that the mere existence of a front-desking policy involved a "concrete application" of the invalid regulations to those class members who were not actually front-desked.[28] Because only those class members (if any) who were front-desked have ripe claims over which the District Courts should exercise jurisdiction, we must vacate the judgment of the Court of Appeals, and remand with directions to remand to the respec-

---

of telling whether this individual was a *LULAC* class member (that is, whether she would otherwise have been eligible for legalization), nor whether she had a completed application ready for filing and payment in hand.

[28] The record reveals relatively little about the application of the front-desking policy and surrounding circumstances. Although we think it unlikely, we cannot rule out the possibility that further facts would allow class members who were not front-desked to demonstrate that the front-desking policy was nevertheless a substantial cause of their failure to apply, so that they can be said to have had the "advanced parole" or "facially valid document" regulation applied to them in a sufficiently concrete manner to satisfy ripeness concerns.

tive District Courts for proceedings to determine which class members were front-desked.[29]

The judgment of the Court of Appeals is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE O'CONNOR, concurring in the judgment.

I agree that the District Courts in these two cases, *Reno* v. *Catholic Social Services, Inc. (CSS)*, and *INS* v. *League of United Latin American Citizens (LULAC)*, erred in extending the application period for legalization beyond May 4, 1988, the end of the 12-month interval specified by the Immigration Reform and Control Act of 1986. I would not, however, reach this result on ripeness grounds. The Court holds that a member of the plaintiff class in *CSS* or *LULAC* who failed to apply to the INS during the 12-month period does not now have a ripe claim to extend the application deadline. In my view, that claim *became ripe* after May 4, 1988, even if it was not ripe before. The claim may well lack merit, but it is no longer premature.

The Court of Appeals did not consider the problem of ripeness, and the submissions to this Court have not discussed

---

[29] Although we do not reach the question of remedy on this disposition of the case, we note that, by definition, each *CSS* and *LULAC* class member who was front-desked presented at an INS office to an INS employee an application that under the terms of the Reform Act (as opposed to the terms of the invalid regulation) entitled him to an adjustment of status. Under any reasonable interpretation of the word, such an individual "applied" for an adjustment of status within the 12-month period under § 1255a(a)(1)(A). Because that individual timely applied, the INS need only readjudicate the application, and grant the individual the relief to which he is entitled. Since there is no statutory deadline for processing the applications, and since a front-desked individual need not await a deportation order before obtaining judicial review, there is no reason to think that a district court would lack the power to order such relief.

that problem except in passing. See Pet. for Cert. 11, n. 13; Brief for Petitioners 20; Brief for Respondents 17, n. 23. Rather, certiorari was granted on two questions, to which the parties rightly have adhered: first, whether the District Courts had jurisdiction under 8 U. S. C. § 1255a(f), the judicial-review provision of Title II of the Reform Act; and second, whether the courts properly extended the application period. See Pet. for Cert. I. The Court finds the jurisdictional challenge meritless under *McNary* v. *Haitian Refugee Center, Inc.*, 498 U. S. 479 (1991), see *ante*, at 53–56, as do I. But instead of proceeding to consider the second question presented, the Court *sua sponte* attempts to resolve the case on ripeness grounds. It reaches out to hold that "the promulgation of the challenged regulations did not itself give each *CSS* and *LULAC* class member a ripe claim; a class member's claim would ripen only once he took the affirmative steps that he could take before the INS blocked his path by applying the regulation to him." *Ante*, at 59. This is new and, in my view, incorrect law. Moreover, even if it *is* correct, the new ripeness doctrine propounded by the Court is irrelevant to the case at hand.

Our prior cases concerning anticipatory challenges to agency rules do not specify when an anticipatory suit may be brought against a benefit-conferring rule, such as the INS regulations here. An anticipatory suit by a would-be beneficiary, who has not yet applied for the benefit that the rule denies him, poses different ripeness problems than a pre-enforcement suit against a duty-creating rule, see *Abbott Laboratories* v. *Gardner*, 387 U. S. 136, 148–156 (1967) (permitting pre-enforcement suit). Even if he succeeds in his anticipatory action, the would-be beneficiary will not receive the benefit until he actually applies for it; and the agency might then deny him the benefit on grounds other than his ineligibility under the rule. By contrast, a successful suit against the duty-creating rule will relieve the plaintiff immediately of a burden that he otherwise would bear.

Yet I would not go so far as to state that a suit challenging a benefit-conferring rule is necessarily unripe simply because the plaintiff has not yet applied for the benefit. "Where the inevitability of the operation of a statute against certain individuals is patent, it is irrelevant to the existence of a justiciable controversy that there will be a time delay before the disputed provisions will come into effect." *Regional Rail Reorganization Act Cases,* 419 U. S. 102, 143 (1974). If it is "inevitable" that the challenged rule will "operat[e]" to the plaintiff's disadvantage—if the court can make a firm prediction that the plaintiff will apply for the benefit, and that the agency will deny the application by virtue of the rule—then there may well be a justiciable controversy that the court may find prudent to resolve.

I do not mean to suggest that a simple anticipatory challenge to the INS regulations would be ripe under the approach I propose. Cf. *ante,* at 58–59, n. 19. That issue need not be decided because, as explained below, these cases are *not* a simple anticipatory challenge. See *infra,* at 71–74. My intent is rather to criticize the Court's reasoning—its reliance on a categorical rule that would-be beneficiaries cannot challenge benefit-conferring regulations until they apply for benefits.

Certainly the line of cases beginning with *Abbott Laboratories* does not support this categorical approach. That decision itself discusses with approval an earlier case that involved an anticipatory challenge to a benefit-conferring rule.

> "[I]n *United States* v. *Storer Broadcasting Co.,* 351 U. S. 192, the Court held to be a final agency action . . . an FCC regulation announcing a Commission policy that it would not issue a television license to an applicant already owning five such licenses, *even though no specific application was before the Commission.*" 387 U. S., at 151 (emphasis added).

More recently, in *EPA* v. *National Crushed Stone Assn.*, 449 U. S. 64 (1980), the Court held that a facial challenge to the variance provision of an EPA pollution-control regulation was ripe even "prior to application of the regulation to a particular [company's] request for a variance." *Id.*, at 72, n. 12. And in *Pacific Gas & Elec. Co.* v. *State Energy Resources Conservation and Development Comm'n*, 461 U. S. 190 (1983), the Court permitted utilities to challenge a state law imposing a moratorium on the certification of nuclear power plants, even though the utilities had not yet applied for a certificate. See *id.*, at 200–202. To be sure, all of these decisions involved licenses, certificates, or variances, which exempt the bearer from otherwise-applicable duties; but the same is true of the instant cases. The benefit conferred by the Reform Act—an adjustment in status to lawful temporary resident alien, see 8 U. S. C. § 1255a(a)—readily can be conceptualized as a "license" or "certificate" to remain in the United States, or a "variance" from the immigration laws.

As for *Lujan* v. *National Wildlife Federation*, 497 U. S. 871 (1990), the Court there stated:

> "Absent [explicit statutory authorization for immediate judicial review], a regulation is not ordinarily considered the type of agency action 'ripe' for judicial review under the APA until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him. (The major exception, of course, is a substantive rule which as a practical matter requires the plaintiff to adjust his conduct immediately. Such agency action is 'ripe' for review at once, whether or not explicit statutory review apart from the APA is provided.)" *Id.*, at 891–892 (citations omitted).

This language does not suggest that an anticipatory challenge to a benefit-conferring rule will of necessity be constitutionally unripe, for otherwise an "explicit statutory review" provision would not help cure the ripeness problem. Rather, *Lujan* points to the prudential considerations that weigh in the ripeness calculus: the need to "fles[h] out" the controversy and the burden on the plaintiff who must "adjust his conduct immediately." These are just the kinds of factors identified in the two-part, prudential test for ripeness that *Abbott Laboratories* articulated. "The problem is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." 387 U. S., at 149. See *Thomas* v. *Union Carbide Agricultural Products Co.*, 473 U. S. 568, 581–582 (1985) (relying upon *Abbott Laboratories* test); *Pacific Gas, supra,* at 200–203 (same); *National Crushed Stone, supra,* at 72–73, n. 12 (same). At the very least, where the challenge to the benefit-conferring rule is purely legal, and where the plaintiff will suffer hardship if he cannot raise his challenge until later, a justiciable, anticipatory challenge to the rule may well be ripe in the prudential sense. Thus I cannot agree with the Court that ripeness will never obtain until the plaintiff actually applies for the benefit.

But this new rule of ripeness law, even if correct, is irrelevant here. These cases no longer fall in the above-described category of anticipatory actions, where a would-be beneficiary simply seeks to invalidate a benefit-conferring rule before he applies for benefits. As the cases progressed in the District Courts, respondents amended their complaints to request an additional remedy beyond the invalidation of the INS regulations: an extension of the 12-month application period. Compare Sixth Amended Complaint in *CSS* (Record, Doc. No. 140) and First Amended Complaint in *LULAC* (Record, Doc. No. 56) with Third Amended Complaint in *CSS* (Record, Doc. No. 69) and Complaint in *LULAC* (Record,

Doc. No. 1). That period expired on May 4, 1988, and the District Courts *thereafter* granted an extension. See App. to Pet. for Cert. 22a–28a, 50a–60a (orders dated June and August 1988). The only issue before us is whether these orders should have been entered. See *ante*, at 48–49, 52–53. Even if the Court is correct that a plaintiff cannot seek to invalidate an agency's benefit-conferring rule before applying to the agency for the benefit, it is a separate question whether the would-be beneficiary must make the wholly futile gesture of submitting an application *when the application period has expired and he is seeking to extend it.*

In the instant cases, I do not see why a class member who failed to apply to the INS within the 12-month period lacks a ripe claim to extend the application deadline, now that the period actually has expired. If Congress in the Reform Act had provided for an 18-month application period, and the INS had closed the application period after only 12 months, no one would argue that court orders extending the period for 6 more months should be vacated on ripeness grounds. The orders actually before us are not meaningfully distinguishable. Of course, respondents predicate their argument for extending the period on the invalidity of the INS regulations, see *infra*, at 75–77, not on a separate statutory provision governing the length of the period, but this difference does not change the ripeness calculus. The "basic rationale" behind our ripeness doctrine "is to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements," when those "disagreements" are premised on "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Union Carbide, supra,* at 580–581 (internal quotation marks omitted). There is no contingency to the closing of the 12-month application period. It is *certain* that an alien who now applies to the INS for legalization will be denied that benefit because the period has closed. Nor does prudence justify this Court in postponing an alien's claim to extend the period, since that

claim is purely legal and since a delayed opportunity to seek legalization will cause grave uncertainty.

The Court responds to this point by reiterating that class members who failed to apply to the INS have not yet suffered a "concrete" injury, because the INS has not denied them legalization by virtue of the challenged regulations. See *ante*, at 59–60, n. 20. At present, however, class members are seeking to redress a different, and logically prior, injury: the denial of the very opportunity to apply for legalization.

The Court's ripeness analysis focuses on the wrong question: whether "the *promulgation* of the challenged regulations [gave] each *CSS* and *LULAC* class member a ripe claim." *Ante*, at 59 (emphasis added). But the question is not whether the class members' claims were ripe *at the inception of these suits*, when respondents were seeking simply to invalidate the INS regulations and the 12-month application period had not yet closed. Whatever the initial status of those claims, they became ripe once the period had in fact closed and respondents had amended their complaints to seek an extension. In the *Regional Rail Reorganization Act Cases*, this Court held that "since ripeness is peculiarly a question of timing, it is the situation now rather than the situation at the time of the District Court's decision that must govern." 419 U. S., at 140. Accord, *Buckley* v. *Valeo*, 424 U. S. 1, 114–118 (1976) *(per curiam)*. Similarly, in the cases before us, it is the situation now (and, as it happens, at the time of the District Courts' orders), rather than at the time of the initial complaints, that must govern.

The Court also suggests that respondents' claim to extend the application period may well be "flatly" barred by 8 U. S. C. § 1255a(f)(2), which provides: "No denial of adjustment of status [under Title II of the Reform Act] based on a late filing of an application for such adjustment may be reviewed by [any] court . . . ." See *ante*, at 60, n. 20. I find it remarkable that the Court might construe § 1255a(f)(2) as barring *any* suit seeking to extend the application dead-

line set by the INS, while at the same time interpreting § 1255a(f)(1) *not* to bar respondents' substantive challenge to the INS regulations, see *ante*, at 53–56. As the INS itself observes, the preclusive language in § 1255a(f)(1) is "broader" than in § 1255a(f)(2), because the latter provision uses the word "denial" instead of "determination." See Brief for Petitioners 19. If Congress in the Reform Act had provided for an 18-month application period, and the INS had closed the period after only 12 months, I cannot believe that § 1255a(f)(2) would preclude a suit seeking to extend the period by 6 months. Nor do I think that § 1255a(f)(2) bars respondents' claim to extend the period, because that claim is predicated on their substantive challenge to the INS regulations, which in turn is permitted by § 1255a(f)(1). In any event, § 1255a(f)(2) concerns reviewability, not ripeness; whether or not that provision precludes the instant actions, the Court's ripeness analysis remains misguided.

Of course, the closing of the application period was not an unalloyed benefit for class members who had failed to apply. After May 4, 1988, those aliens had ripe claims, but they also became statutorily ineligible for legalization. The Reform Act authorizes the INS to adjust the status of an illegal alien only if he "appl[ies] for such adjustment during the 12-month period beginning on a date . . . designated by the Attorney General." 8 U. S. C. § 1255a(a)(1)(A). As the INS rightly argues, this provision precludes the legalization of an alien who waited to apply until after the 12-month period had ended. The District Courts' orders extending the application period were not unripe, either constitutionally or prudentially, but they *were* impermissible under the Reform Act. "A court is no more authorized to overlook the valid [requirement] that applications be [submitted] than it is to overlook any other valid requirement for the receipt of benefits." *Schweiker* v. *Hansen*, 450 U. S. 785, 790 (1981) *(per curiam)*.

Respondents assert that equity requires an extension of the time limit imposed by § 1255a(a)(1)(A). Whether that provision is seen as a limitations period subject to equitable tolling, see *Irwin* v. *Department of Veterans Affairs,* 498 U. S. 89, 95–96 (1990), or as a substantive requirement subject perhaps to equitable estoppel, see *Office of Personnel Management* v. *Richmond,* 496 U. S. 414, 419–424 (1990), the District Courts needed some special reason to exercise that equitable power against the United States. The only reason respondents adduce is supposed "affirmative misconduct" by the INS. See *Irwin, supra,* at 96 ("We have allowed equitable tolling in situations . . . where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass"); *Richmond, supra,* at 421 ("Our own opinions have continued to mention the possibility, in the course of rejecting estoppel arguments, that some type of 'affirmative misconduct' might give rise to estoppel against the Government"). Respondents argue that the INS engaged in "affirmative misconduct" by promulgating the invalid regulations, which deterred aliens who were ineligible under those regulations from applying for legalization. See Plaintiffs' Submission Re Availability of Remedies for the Plaintiff Class in *CSS,* pp. 6–15 (Record, Doc. No. 164), Plaintiffs' Memorandum on Remedies in *LULAC* (Record, Doc. No. 40). The District Courts essentially accepted the argument, ordering remedies coextensive with the INS' supposed "misconduct." The *CSS* court extended the application period for those class members who "knew of [the INS'] unlawful regulation and thereby concluded that they were ineligible for legalization and by reason of that conclusion did not file an application," App. to Pet. for Cert. 25a; the *LULAC* court provided an almost identical remedy, see *id.,* at 59a.

I cannot agree that a benefit-conferring agency commits "affirmative misconduct," sufficient to justify an equitable extension of the statutory time period for application, simply

by promulgating a regulation that incorrectly specifies the eligibility criteria for the benefit. When Congress passes a benefits statute that includes a time period, it has two goals. It intends *both* that eligible claimants receive the benefit *and* that they promptly assert their claims. The broad definition of "misconduct" that respondents propose would give the first goal absolute priority over the second, but I would not presume that Congress intends such a prioritization. Rather, absent evidence to the contrary, Congress presumably intends that the two goals be harmonized as best possible, by requiring would-be beneficiaries to make a timely application *and* concurrently to contest the invalid regulation. "We have generally been much less forgiving in receiving late filings where the claimant failed to exercise due diligence in preserving his legal rights." *Irwin, supra,* at 96. The broad equitable remedy entered by the District Courts in these cases is contrary to Congress' presumptive intent in the Reform Act, and thus is error. " 'Courts of equity can no more disregard statutory . . . requirements and provisions than can courts of law.' " *INS* v. *Pangilinan,* 486 U. S. 875, 883 (1988) (quoting *Hedges* v. *Dixon County,* 150 U. S. 182, 192 (1893)).

I therefore agree with the Court that the District Courts' orders extending the application period must be vacated. I also agree that "front-desked" aliens already have "applied" within the meaning of § 1255a(a)(1)(A). See *ante,* at 67, n. 29. On remand, respondents may be able to demonstrate particular instances of "misconduct" by the INS, beyond the promulgation of the invalid regulations, that might perhaps justify an extension for certain members of the *LULAC* class or the *CSS* class. See Brief for Respondents 16–20, 35–42. I would not preclude the possibility of a narrower order requiring the INS to adjudicate the applications of both "front-desked" aliens and some aliens who were not "front-desked," but neither would I endorse that possibility, because at this

point respondents have made only the most general suggestions of "misconduct."

JUSTICE STEVENS, with whom JUSTICE WHITE and JUSTICE BLACKMUN join, dissenting.

After Congress authorized a major amnesty program in 1986, the Government promulgated two regulations severely restricting access to that program. If valid, each regulation would have rendered ineligible for amnesty the members of the respective classes of respondents in this case. The Government, of course, no longer defends either regulation. See *ante,* at 48, 52. Nevertheless, one of the regulations was in effect for all but 12 days of the period in which applications for legalization were accepted; the other, for over half of that period. See *ante,* at 48, 50–51. Accordingly, after holding the regulations invalid, the District Courts entered orders extending the time for filing applications for certain class members. See *ante,* at 48–49, 52.

On appeal, the Government argued that the District Courts lacked jurisdiction both to entertain the actions and to provide remedies in the form of extended application periods. The Court of Appeals rejected the first argument on the authority of our decision in *McNary* v. *Haitian Refugee Center, Inc.,* 498 U. S. 479 (1991). *Catholic Social Services, Inc.* v. *Thornburgh,* 956 F. 2d 914, 919–921 (CA9 1992). As the Court holds today, *ante,* at 53–56, that ruling was plainly correct. The Court of Appeals also correctly rejected the second argument advanced by the Government, noting that extension of the filing deadline effectuated Congress' intent to provide "meaningful opportunities to apply for adjustments of status," which would otherwise have been frustrated by enforcement of the invalid regulations. 956 F. 2d, at 921–922. We should, accordingly, affirm the judgment of the Court of Appeals.

This Court, however, finds a basis for prolonging the litigation on a theory that was not argued in either the District

Courts or the Court of Appeals, and was barely mentioned in this Court: that respondents' challenges are not, for the most part, "ripe" for adjudication. *Ante,* at 57–61. I agree with JUSTICE O'CONNOR, *ante,* p. 67 (opinion concurring in judgment), that the Court's rationale is seriously flawed. Unlike JUSTICE O'CONNOR, however, see *ante,* at 73, I have no doubt that respondents' claims were ripe as soon as the concededly invalid regulations were promulgated.

Our test for ripeness is two pronged, "requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Laboratories* v. *Gardner,* 387 U. S. 136, 149 (1967). Whether an issue is fit for judicial review, in turn, often depends on "the degree and nature of [a] regulation's present effect on those seeking relief," *Toilet Goods Assn., Inc.* v. *Gardner,* 387 U. S. 158, 164 (1967), or, put differently, on whether there has been some "concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him," *Lujan* v. *National Wildlife Federation,* 497 U. S. 871, 891 (1990). As JUSTICE O'CONNOR notes, we have returned to this two-part test for ripeness time and again, see *ante,* at 71, and there is no question but that the *Abbott Laboratories* formulation should govern this case.

As to the first *Abbott Laboratories* factor, I think it clear that the challenged regulations have an impact on respondents sufficiently "direct and immediate," 387 U. S., at 152, that they are fit for judicial review. My opinion rests, in part, on the unusual character of the amnesty program in question. As we explained in *McNary:*

> "The Immigration Reform and Control Act of 1986 (Reform Act) constituted a major statutory response to the vast tide of illegal immigration that had produced a 'shadow population' of literally millions of undocumented aliens in the United States. . . . [I]n recognition that a large segment of the shadow population played a

useful and constructive role in the American economy, but continued to reside in perpetual fear, the Reform Act established two broad amnesty programs to allow existing undocumented aliens to emerge from the shadows." 498 U. S., at 481–483 (footnotes omitted).[1]

A major purpose of this ambitious effort was to eliminate the fear in which these immigrants lived, "'afraid to seek help when their rights are violated, when they are victimized by criminals, employers or landlords or when they become ill.'" *Ayuda, Inc.* v. *Thornburgh*, 292 U. S. App. D. C. 150, 168, 948 F. 2d 742, 760 (1991) (Wald, J., dissenting) (quoting H. R. Rep. No. 99–682, pt. 1, p. 49 (1986)). Indeed, in recognition of this fear of governmental authority, Congress established a special procedure through which "qualified designated entities," or "QDE's," would serve as a channel of communication between undocumented aliens and the INS, providing reasonable assurance that "emergence from the shadows" would result in amnesty and not deportation. 8 U. S. C. § 1255a(c)(2); see *Ayuda*, 292 U. S. App. D. C., at 168, and n. 1, 948 F. 2d, at 760, and n. 1.

Under these circumstances, official advice that specified aliens were ineligible for amnesty was certain to convince those aliens to retain their "shadow" status rather than come forward. At the moment that decision was made—at the moment respondents conformed their behavior to the invalid regulations—those regulations concretely and directly affected respondents, consigning them to the shadow world from which the Reform Act was designed to deliver them, and threatening to deprive them of the statutory entitlement that would otherwise be theirs.[2] Cf. *Lujan*, 497 U. S., at 891 (concrete application threatening harm as basis for ripeness).

---

[1] This case involves the first, and more important, of the two amnesty programs; *McNary* involved the second.

[2] As the majority explains, the classes certified in both actions were limited to persons otherwise eligible for legalization. See *ante*, at 47–48, 51.

The majority concedes, of course, that class members whose applications were "front-desked" felt the effects of the invalid regulations concretely, because their applications were "blocked then and there." See *ante*, at 63. Why "then and there," as opposed to earlier and elsewhere, should be dispositive remains unclear to me; whether a potential application is thwarted by a front-desk Legalization Assistant, by advice from a QDE, by consultation with a private attorney, or even by word of mouth regarding INS policies, the effect on the potential applicant is equally concrete, and equally devastating. In my view, there is no relevant difference, for purposes of ripeness, between respondents who were "front-desked" and those who can demonstrate, like the *LULAC* class, that they "'learned of their ineligibility following promulgation of the policy and who, relying upon information that they were ineligible, did not apply,'" *ante*, at 51, or, like the class granted relief in *CSS*, that they "'knew of [the INS'] unlawful regulation and thereby concluded that they were ineligible for legalization and by reason of that conclusion did not file an application,'" *ante*, at 48–49. As Judge Wald explained in *Ayuda:*

> "[T]he majority admits that if low level INS officials had refused outright to accept legalization applications for filing, the district court could hear the suit. Even if the plaintiffs' affidavits are read to allege active discouragement rather than outright refusal to accept, this is a subtle distinction indeed, and one undoubtedly lost on the illegal aliens involved, upon which to grant or deny jurisdiction to challenge the practice." 292 U. S. App. D. C., at 169, n. 3, 948 F. 2d, at 761, n. 3 (dissenting opinion) (citation omitted).

The second *Abbott Laboratories* factor, which focuses on the cost to the parties of withholding judicial review, also weighs heavily in favor of ripeness in this case. Every day during which the invalid regulations were effective meant

another day spent in the shadows for respondents, with the attendant costs of that way of life. See *supra*, at 78–79. Even more important, with each passing day, the clock on the application period continued to run, increasing the risk that review, when it came, would be meaningless because the application period had already expired. See *Ayuda*, 292 U. S. App. D. C., at 178, 948 F. 2d, at 770 (Wald, J., dissenting).[3] Indeed, the dilemma respondents find themselves in today speaks volumes about the costs of deferring review in this situation. Cf. *Toilet Goods Assn.*, 387 U. S., at 164 (challenge not ripe where "no irremediable adverse consequences flow from requiring a later challenge").

Under *Abbott Laboratories*, then, I think it plain that respondents' claims were ripe for adjudication at the time they were filed. The Court's contrary holding, which seems to rest on the premise that respondents cannot challenge a condition of legalization until they have satisfied all other conditions, see *ante*, at 58–59, is at odds not only with our ripeness case law, but also with our more general understanding of the way in which government regulation affects the regulated. In *Northeastern Fla. Chapter, Associated Gen. Contractors of America* v. *Jacksonville*, 508 U. S. 656 (1993), for instance, we held that a class of contractors could challenge an ordinance making it more difficult for them to compete for public business without making any showing that class members were actually in a position to receive such business,

---

[3] "Absent judicial action, the period for filing for IRCA legalization would have ended and thousands of persons would have lost their chance for amnesty. In purely human terms, it is difficult—perhaps impossible—for those of us fortunate enough to have been born in this country to appreciate fully the value of that lost opportunity. For undocumented aliens, IRCA offered a one-time chance to come out of hiding, to stop running, to 'belong' to America. The hardship of withholding judicial review is as severe as any that I have encountered in more than a decade of administrative review." 292 U. S. App. D. C., at 178, 948 F. 2d, at 770 (Wald, J., dissenting).

absent the challenged regulation. We announced the following rule:

> "When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing. The 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Id.*, at 666.[4]

Our decision in the *Jacksonville* case is well supported by precedent; the Court's ripeness holding today is notable for its originality.

Though my approach to the ripeness issue differs from that of JUSTICE O'CONNOR, we are in agreement in concluding that respondents' claims are ripe for adjudication. We also agree that the validity of the relief provided by the District Courts, in the form of extended application periods, turns on whether that remedy is consistent with congressional intent. See *ante*, at 76 (opinion concurring in judgment); *American Pipe & Constr. Co.* v. *Utah*, 414 U. S. 538, 557–558 (1974) (equitable relief must be "consonant with the legislative scheme"); *Weinberger* v. *Romero-Barcelo*, 456 U. S. 305, 313 (1982) (courts retain broad equity powers to enter remedial orders absent clear statutory restriction); *INS* v. *Pangilinan*, 486 U. S. 875, 883 (1988) (courts of equity bound by statutory requirements). Where I differ from

---

[4] *Jacksonville* is, of course, an equal protection case, while respondents in this case are seeking a statutory benefit. If this distinction has any relevance to a ripeness analysis, then it should mitigate in favor of finding ripeness here; I assume we should be more reluctant to overcome jurisdictional hurdles to decide constitutional issues than to effectuate statutory programs.

JUSTICE O'CONNOR is in my determination that extensions of the application period in this case were entirely consistent with legislative intent, and hence well within the authority of the District Courts.

It is no doubt true that "[w]hen Congress passes a benefits statute that includes a time period, it has two goals." See *ante*, at 76 (opinion concurring in judgment). Here, Congress' two goals were finality in its one-time amnesty program, and the integration of productive aliens into the American mainstream. See *Perales* v. *Thornburgh*, 967 F. 2d 798, 813 (CA2 1992). To balance both ends, and to achieve each, Congress settled on a 12-month application period. Twelve months, Congress determined, would be long enough for frightened aliens to come to understand the program and to step forward with applications, especially when the full period was combined with the special outreach efforts mandated by the Reform Act. *Ibid.;* see 8 U. S. C. § 1255a(i) (requiring broad dissemination of information about amnesty program); § 1255a(c)(2) (establishing QDE's). The generous 12-month period would also serve the goal of finality, by "'ensur[ing] true resolution of the problem and . . . that the program will be a one-time-only program.'" 967 F. 2d, at 813 (quoting H. R. Rep. No. 99–682, pt. 1, at 72.

The problem, of course, is that the full 12-month period was never made available to respondents. For the *CSS* class, the 12-month period shrank to precisely 12 days during which they were eligible for legalization; for the *LULAC* class, to roughly 5 months. See *supra*, at 77. Accordingly, congressional intent required an extension of the filing deadline, in order to make effective the 12-month application period critical to the balance struck by Congress. See 956 F. 2d, at 922; *Perales*, 967 F. 2d, at 813.

That congressional intent is furthered, not frustrated, by the equitable relief granted here distinguishes this case from *Pangilinan*, in which we held that a court lacked the authority to order naturalization for certain persons after expira-

tion of a statutory deadline.   486 U. S., at 882–885.   In *Pangilinan*, we were faced with a "congressional command [that] could not be more manifest" specifically precluding the relief granted.   *Id.*, at 884.   The Reform Act, on the other hand, contains no such explicit limitation.[5]   Indeed, the Reform Act does not itself contain a statutory deadline at all, leaving it largely to the Attorney General to delineate a 12-month period.   8 U. S. C. § 1255a(a)(1)(A).   This delegation highlights the relative insignificance to Congress of the application cutoff date, as opposed to the length of the application period itself.   See *Perales*, 967 F. 2d, at 813, n. 4.

Finally, I can see no reason to limit otherwise available relief to those class members who experienced "front-desking," on the theory that they have "applied" for legalization.   Cf. *ante*, at 67, n. 29; *ante*, at 76–77 (O'CONNOR, J., concurring in judgment).   It makes no sense to condition relief on the filing of a futile application.   Indeed, we have already rejected the proposition that such an application is necessary for receipt of an equitable remedy.   In *Teamsters* v. *United States*, 431 U. S. 324 (1977), a case involving discriminatory employment practices under Title VII of the Civil Rights Act of 1964, we held that those who had been deterred from applying for jobs by an employer's practice of rejecting applicants like themselves were eligible for relief along with those who had unsuccessfully applied.   We reasoned:

> "A consistently enforced discriminatory policy can surely deter job applications from those who are aware of it and are unwilling to subject themselves to the humiliation of explicit and certain rejection.

---

[5] There is no language in the Reform Act prohibiting an extension of the application period.   Section 1255a(f)(2), relied on by the Government, see Brief for Petitioners 28–29, precludes review of *individual* late-filed applications; like § 1255a(f)(1), it has no bearing on the kind of broad-based challenge and remedy at issue here.   See *ante*, at 55, and n. 17; *ante*, at 73–74 (O'CONNOR, J., concurring in judgment).

"... When a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture he is as much a victim of discrimination as is he who goes through the motions of submitting an application." 431 U. S., at 365–366.

The same intelligent principle should control this case. A respondent who can show that she would have applied for legalization but for the invalid regulations is "in a position analogous to that of an applicant," and entitled to the same relief. See *id.*, at 368.

In my view, then, the Court of Appeals was correct on both counts when it affirmed the District Court orders in this case: Respondents' claims were justiciable when filed, and the relief ordered did not exceed the authority of the District Courts. Accordingly, I respectfully dissent.