NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0563n.06

No. 09-3722

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
**Aug 27, 2010**
LEONARD GREEN, Clerk

SAIDOU YERO SAO,                    )
                                    )
        Petitioner,                 )
                                    )
v.                                  )    ON PETITION FOR REVIEW OF
                                    )    AN ORDER OF THE BOARD OF
ERIC H. HOLDER, JR., Attorney General,  )    IMMIGRATION APPEALS
                                    )
        Respondent.                 )
                                    )
                                    )
                                    )
                                    )
                                    )
                                    )

Before:    BOGGS, SILER, and MOORE, Circuit Judges.

PER CURIAM. Saidou Yero Sao ("Sao") petitions for review of an order of the Board of

Immigration Appeals ("BIA") dismissing his appeal from the decision of an Immigration Judge

("IJ") denying his applications for asylum, withholding of removal, and relief under the Convention

Against Torture ("CAT").

**I**

Sao is a native and citizen of Mauritania. According to his application for asylum and his

testimony before the IJ, he was born a member of the minority Fulani tribe in 1967 and grew up on

his family's rice farm in the Fulani village of Sylla.

Sao claims that in 1989 government forces came to Sylla and accused the villagers there of having stolen irrigation equipment that the villagers had been sharing; in reality, Sao asserts, the equipment had previously been given to them by the government. In his testimony before the IJ, Sao further claimed that, when the government forces loaded the equipment onto their truck to take it away, some of the villagers attempted to resist, at which point he was beaten with sticks and his brother was shot in the foot. Though his brother apparently required hospital treatment, Sao's testimony does not disclose whether he himself required medical aid.

Sao testified that, following the incident in 1989, neither he nor any of his family were injured by government officials, but that between 1989 and 1992 government forces in the area occasionally imposed a curfew on the residents, told them to stay away from a nearby river, or demanded a lamb for their dinner. Sao claims that, chafed by these indignities and afraid he would be killed, he left the rice farm for neighboring Senegal but did not seek formal admission to that country. Sao testified that no particular incident caused him to leave Mauritania, and that, after his departure, his parents continued to work the farm until 2002—when they themselves moved to Senegal—while experiencing the same kind of occasional harassment from government forces. Sao testified that the farm is now worked by his cousins, who do so free of government interference.

Once in Senegal, Sao claims, he stayed with his aunt and uncle and made a living as a street vendor selling shoes and various other items. According to Sao, this arrangement lasted until February 2001, when a merchant he knew by the name of Mamud Dai offered to obtain fraudulent travel documents for him so that he could enter the United States. After paying Dai 600,000 Senegalese francs, Sao allegedly flew from Dakar, Senegal to New York with Dai on February 10,

2001.  Though Sao claims to have seen a Senegalese passport issued in the name "Mamadou Mamadou Watt" with his own picture in it, Dai allegedly kept both his and Sao's passports and visa documents with him, and spoke for both of them, as they cleared immigration in New York.

Immediately upon clearing immigration, Sao testified, he and Dai traveled by taxi to a bus station where Dai purchased a bus ticket to Columbus, Ohio for Sao.  Sao testified that he chose Columbus because a friend of his, Ibrahim Dia, lived there; that he arrived in Columbus on February 12, 2001; and that he was met at the Columbus bus station by Dia's neighbor, Abou Ali Ba.  Sao told the IJ that he remained in contact with Mamud Dai for a while, but that he hadn't spoken with Dai for approximately three years because he had lost Dai's telephone number.

Sao filed an application for asylum and withholding of removal with the INS on June 9, 2001.  On August 20, 2007, he testified before the IJ as described above.  In addition to the testimony about the circumstances surrounding Sao's life in Mauritania and Senegal, and his travel to the United States, the following exchange took place between the IJ and Sao:

> Q.      Sir, let me ask you this, have you ever applied for any other immigration benefits in the United States?
>
> A.      Yes.
>
> Q.      You have?  What did you apply for?
>
> A.      I did apply for (indiscernible), I used the same name cause I've been here seven years and I've not seen my family and I was trying to get in through immigration to go see my family.  That's why I applied for it.
>
> Q.      Have you ever stated that you came to the United States on a date other than February 10, 2001?
>
> A.      The guy actually put some other date.

Q.     Well, was that date incorrect?

A.     Yeah, the date he put was not correct.

Q.     Well, why did you agree to let him put that on a government form if it was wrong?

A.     Yeah, because he told me that if I applied for it I would get authorization to go see my family and come back. That's why I did it.

Sao also entered into evidence an affidavit from Abou Ali Ba. According to the affidavit, Ba picked up Sao at the Columbus bus station on February 12, 2001 and took him to the house of Sao's friend, Ibrahim Dia. The affidavit further claims that, while en route to Dia's home, Sao told Ba "that he had just arrived from Senegal via New York, New York on February 11, 2001." Sao also submitted a document purportedly issued by the Mauritanian police as a warrant for his arrest on charges of "subversive activities"; according to Sao, a friend of his in Mauritania was able to procure a copy of the document and send it to him. Similarly, Sao submitted a copy of his Mauritanian "national identity card," which was also obtained by someone in Mauritania on his behalf.

The IJ denied Sao's applications for relief on August 20, 2007, the same day as the hearing. As an initial matter, the IJ found that Sao had failed to meet his burden of establishing by clear and convincing evidence that his asylum application had been filed within one year of his arrival in the United States.

The IJ made additional findings that Sao was "minimally credible," explaining that Sao's testimony was plausible and consistent with respect to the events that had happened to him, but also expressing disbelief that the Mauritanian government was looking for him for "subversive activities." He also held that the harms suffered by Sao did not rise to the level of persecution, and

that, given the slight nature of those harms and the fact that Sao's family continued to work the family farm unmolested, it was improbable that he would be subject to persecution if returned to Mauritania. For the same reasons, the IJ found that Sao had failed to meet the burden of demonstrating it was probable that he would be tortured if removed.

Sao appealed to the BIA, which issued an opinion dismissing the appeal on May 19, 2009. In its opinion, the BIA held that the IJ's reliance on the one-year bar in dismissing Sao's asylum application was proper, given that Sao could not supply corroborative evidence and had previously given the Government a different date of entry. The BIA also held that, because Sao had admitted that he had given a different date of entry, there was no need for the Government to introduce into evidence the application on which that different date appeared. The BIA also agreed with the IJ's analysis of the withholding of removal and CAT applications, holding that Sao had failed to demonstrate either past persecution or torture, or a likelihood that they would occur in the future if he were returned to Mauritania.

This timely appeal followed.

## II

"Where the BIA reviews an immigration judge's decision and issues a separate opinion, rather than summarily affirming the immigration judge's decision, we review the BIA's decision as the final agency determination. To the extent the BIA adopted the immigration judge's reasoning, however, this Court also reviews the immigration judge's decision." *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009).

In removal proceedings, we review legal conclusions de novo and factual findings under the "substantial evidence" standard. *See Ndrecaj v. Mukasey*, 522 F.3d 667, 672 (6th Cir. 2008). Under the substantial evidence standard, "findings of fact are 'conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004) (quoting 8 U.S.C. § 1252(b)(4)(B)). "To reverse[,] . . . we must find that the evidence 'not only supports a contrary conclusion, but indeed *compels it*.'" *Almuhtaseb v. Gonzales*, 453 F.3d 743, 749 (6th Cir. 2006) (quoting *Yu*, 364 F.3d at 702).

Generally, an alien may not apply for asylum unless he "demonstrates by clear and convincing evidence that the application has been filed within 1 year after the date of the alien's arrival in the United States." 8 U.S.C. § 1158(a)(2)(B). Moreover, Congress has provided that "[n]o court shall have jurisdiction to review any determination of the Attorney General" with respect to the timeliness of an alien's asylum application. 8 U.S.C. § 1158(a)(3). However, we have held that § 1158(a)(3) "bar[s] our review of asylum applications denied for untimeliness only when the appeal seeks review of discretionary or factual questions, but not when the appeal seeks review of constitutional claims or matters of statutory construction." *Almuhtaseb*, 453 F.3d at 748 (6th Cir. 2006). Thus we lack jurisdiction to hear Sao's appeal to the extent that it presents factual questions regarding the date of his entry into the United States, but may consider issues of Constitutional import or of law.

**III**

A

Sao argues that his procedural due process rights were violated when the IJ considered "impeachment evidence" not in the record in determining that Sao's unsupported testimony as to his date of entry into the United States was insufficient to meet the "clear and convincing" standard required by statute. Specifically, he contends that the IJ "relied heavily" on an extra-record "LULAC application" on which Sao had listed a different date of entry.[1]

Sao's argument is reviewable, because it is grounded in the Constitution. The Fifth Amendment's guarantee of the right to procedural due process applies to aliens in a removal hearing. *Zadvydas v. Davis*, 533 U.S. 678, 693–94 (2001). A violation of that right "occurs when the proceeding was so fundamentally unfair that the alien was prevented from reasonably presenting his

---

[1]The precise nature of the form on which Sao allegedly put a different date of entry is unclear from the record. The IJ's order denying Sao's application refers to it as an "application for LULAC benefits." Sao's testimony indicates that he made the application so that he "would get authorization to go see my family and come back." The Government, in its brief on appeal, asserts that the benefits in question were sought "under the terms of the settlement agreement in *Reno v. Catholic Social Services*, 509 U.S. 43 (1993)." *Reno* vacated and remanded a Ninth Circuit decision that would, on remand, be called *League of United Latin American Citizens v. INS*, 999 F.2d 1362 (9th Cir. 1993) ("*LULAC*"). That class-action litigation arose when numerous illegal aliens alleged that the INS had illegally denied their applications for entry into a program enacted as part of the Immigration Reform and Control Act of 1986 ("IRCA"), under which they could become lawful permanent residents. Eligibility for membership in that class has been affected by numerous lawsuits and legislative enactments; for our purposes, however, it is sufficient to note that the IRCA program applied only to aliens who had "resided continuously in the United States in unlawful status since at least January 1, 1982." *Reno*, 509 U.S. at 46. Presumably, then, Sao's application listed a date of entry prior to January 1, 1982; his claim that he was obtaining authorization to see his family may refer to the fact that some applicants for *LULAC* class benefits are entitled to a stay of deportation, employment authorization, and permission to travel abroad during the pendency of their application.

case." *Hassan v. Gonzales*, 403 F.3d 429, 436 (6th Cir. 2005). By contrast, when the alien seeking asylum is given "a reasonable opportunity to examine the evidence against him, to present evidence on his own behalf, and to cross-examine witnesses presented by the Government," his procedural due process rights are not violated. *Mikhailevitch v. INS*, 146 F.3d 384, 391 (6th Cir. 1998).

Nevertheless, Sao's argument fails. While the IJ may have been aware of the *LULAC* application, the actual evidence that Sao had provided a different date of entry came in the form of Sao's own testimony. He was not denied the opportunity to examine the evidence against him; he spoke it himself. Nor did the IJ's questioning take the form of an accusation about information on a document that Sao could not see, or imply that such evidence even existed. Rather, the judge asked only whether Sao had applied for any other immigration benefits, and whether Sao had ever stated that he came to the United States on a date other than February 10, 2001. These questions are unambiguously relevant in immigration proceedings. At the very most, the IJ may have been prompted to ask them by the LULAC application; this does not, however, make an otherwise-permissible question off-limits.

Given that Sao was simply asked the questions at issue, and not hectored about statements he may have made on an extra-record document, the IJ's actions came nowhere near the level of fundamental unfairness required for us to hold that Sao's right to due process was violated. Sao was not prevented from presenting his case, nor was he denied the opportunity to examine the evidence

against him. Because no constitutional error was committed, we lack the authority to grant Sao's petition with respect to his asylum application.[2]

B

The one-year bar on Sao's asylum application does not prevent him from applying for withholding of removal or protection under the CAT. An alien seeking withholding of removal must demonstrate that his "life or freedom would be threatened in [the country to which he is to be removed] because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). To be eligible for CAT relief, an alien must show that it is "more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16.

An applicant may satisfy his or her burden of proof for withholding of removal by demonstrating that he has suffered past persecution in the country of removal on account of one of the aforementioned protected grounds. 8 C.F.R. § 1208.16(b)(1)(i). This showing triggers a rebuttable presumption that the applicant's life or freedom would be threatened in the future if he or she were removed to that country. *Ibid.* As an alternative to demonstrating past persecution, an applicant may seek withholding of removal by establishing that "it is more likely than not that he or she would be persecuted on account of" one of the protected grounds if he or she were removed. 8 C.F.R. § 1208.16(b)(2).

---

[2]Sao also argues that he "benefits from a rebuttable presumption of credibility on appeal" that extends to his assertion that he entered the United States within one year of his application for asylum. Such an argument, however, goes to the factual question of when he entered the country, and not the constitutional question of whether he was denied due process at his hearing.

The testimony of the applicant, if credible, may by itself be sufficient to sustain the burden of proof without corroboration. *Dorosh v. Ashcroft*, 398 F.3d 379, 382 (6th Cir. 2004). In this case, the IJ found Sao to be "minimally credible" with respect to his testimony about the events that happened to him in Mauritania and Senegal. Sao argues that the IJ's assessment that he was "minimally credible" has no legal force, because the IJ was required to make a clean assessment of credibility; in other words, either to accord Sao full credibility or to find him not credible for specific reasons.

Sao's argument is perhaps correct, but is nevertheless irrelevant. The BIA's decision as it pertained to withholding of removal and relief under the Convention Against Torture was in no way predicated on a disbelief of the factual allegations relevant to those claims. Rather, the BIA agreed with the IJ's analysis that, even assuming every word of Sao's story about his experiences in Mauritania to be true, those experiences did not rise to the level of persecution or torture necessary to qualify an alien for withholding of removal or protection under the CAT. Thus review of this issue is governed by our decision in *Haider v. Holder*, 595 F.3d 276, 282 (6th Cir. 2010), in which we held that

> when an IJ or the BIA expresses suspicion about an applicant's lack of credibility but the BIA fails to make an explicit adverse determination and instead denies relief on some other basis, we will assume that the applicant was credible in order to review the actual grounds for the ruling. . . . If we conclude that the stated basis for denying relief was supported by substantial evidence, further review is foreclosed.

In this case, however, we need not even reach the question of whether the stated basis for denying relief was supported by substantial evidence, because Sao does not, on appeal, contest the determinations below that he did not suffer persecution or torture. Arguments not raised on appeal

are considered abandoned and are not reviewable on appeal. *See Robinson v. Jones*, 142 F.3d 905, 906 (6th Cir. 1998).

We further find no sufficient basis to fault the BIA's determination that Sao has not established that he reasonably fears future persecution upon his return to Mauritania. Sao argues that "[t]he Immigration Judge improperly discredited [his] documentary evidence . . . namely the search warrant" purporting to show that he was wanted for "subversive activities" by the Mauritanian police. Sao appears to argue that, because the IJ did not make a specific finding that he was not credible, all documentary evidence he produced was entitled to a presumption of credibility as well. Yet this is an assertion with no support. 8 U.S.C. § 1158(b)(1)(B)(ii) provides that

> The testimony of the applicant may be sufficient to sustain the applicant's burden without corroboration, but only if the applicant satisfies the trier of fact that the applicant's testimony is credible . . . . In determining whether the applicant has met the applicant's burden, the trier of fact may weigh the credible testimony *along with other evidence of record*.

(emphasis added). Thus credibility determinations pertain to the *testimony* provided by the applicant, as distinct from "other evidence of record." Though these determinations also doubtless extend to an alien's testimony *about* documents entered into evidence to the extent that the alien has personal knowledge of them, it does not automatically imbue the contents of those documents with legitimacy. In this case, the IJ discounted the purported search warrant because Sao had admitted that such documents are often and easily forged in Mauritania and Sao did not know how the document had been obtained.[3] This is not an observation that bears in any way on Sao's credibility;

---

[3]Sao testified that the search warrant had been obtained by a friend in Mauritania, but that Sao himself had no knowledge of how his friend had done so. The IJ's reluctance to accept the

the IJ's rationale went to the circumstances under which the document was produced in Mauritania, not the circumstances attending Sao's own acquisition of it. Moreover, the IJ further observed that Sao had never engaged in significant resistance in Mauritania and had not even been present in the country since 1992, and both the IJ and the BIA emphasized that Sao's family had suffered no persecution since his departure despite being in circumstances identical to those Sao would find himself in were he to be returned. Sao has made no effort on appeal to address the substance of these arguments, and we therefore find ourselves far from compelled to come to a contrary conclusion.[4]

### III

For the reasons discussed above, the petition for review is **DENIED**.

---

warrant as genuine is therefore particularly well-founded in light of the fact that Sao, in explaining how a friend of his in Mauritania was able to obtain a copy of Sao's national identity card, told the IJ that "[i]n Mauritania, you can actually have documents, I mean, without your presence cause they are corrupt."

[4]In his argument on appeal, Sao alleges that country conditions have worsened in Mauritania following a military coup in 2008, and that such conditions contribute to his subjective and objectively reasonable fear of future persecution; by way of support, he attaches the State Department's 2008 Human Rights Report on Mauritania. This evidence was not submitted in his 2009 appeal to the BIA and is thus not properly before us. *See* 8 U.S.C. § 1252(b)(4)(A) ("[T]he court of appeals shall decide the petition only on the administrative record on which the order of removal is based . . . ."). We note that an alien seeking asylum based on changed country conditions in the country to which removal has been ordered may, in certain circumstances, file a motion to reopen removal proceedings with the BIA pursuant to 8 U.S.C. § 1229a(7).