In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 09-3912, 10-1282 & 10-3221

MOHSIN H. SIDDIQUI,

*Petitioner,*

*v.*

ERIC H. HOLDER, JR., Attorney General
of the United States,

*Respondent.*

Petitions for Review of an Order
of the Board of Immigration Appeals.
No. A093-056-464

ARGUED SEPTEMBER 22, 2011—DECIDED JANUARY 12, 2012

Before POSNER, FLAUM, and SYKES, *Circuit Judges*.

FLAUM, *Circuit Judge*. Mohsin H. Siddiqui, a native of
Pakistan, appeals the denial of his legalization applica-
tions by the Administrative Appeals Office ("AAO"),
the appellate body of the U.S. Citizenship and Immigra-
tion Services ("USCIS"). Siddiqui disputes the AAO's
finding that he failed to prove his continuous residence
in the United States and the AAO's retroactive applica-

tion of the definition of "conviction," found in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009, to his 1991 felony.

We are unable to affirm the AAO's conclusion regarding Siddiqui's failure to establish continuous residence because the AAO's decisions lack individualized analysis and do not identify particular deficiencies in the substantial evidence submitted by Siddiqui. Further, we conclude that the AAO erred in applying IIRIRA's definition to Siddiqui's offense because Congress did not clearly express its intent to apply the definition retroactively to individuals such as Siddiqui, whose legalization applications would have been adjudicated prior to the enactment of IIRIRA if the government had not unlawfully refused in late 1980s to accept applications from applicants who had briefly left the country. We therefore vacate the removal order and remand so that the AAO can properly address the evidence in support of Siddiqui's claim of continuous residence.

## I. Background

Siddiqui entered the United States from Pakistan on a visitor's visa in December 1979, when he was thirteen years old. Although his visa expired in April 1980, he settled down in St. Louis, Missouri, where he lived with different friends and worked various jobs.

In 1986, Congress enacted the Immigration Reform and Control Act ("IRCA"), Pub. L. No. 99-603, 100 Stat. 3359,

which allows certain aliens who entered the United States before 1982 and have remained continuously and unlawfully present to apply for temporary residency and then to apply for permanent residency one year later. *See* 8 U.S.C. § 1255a. This process is known as "legalization." *See id.* In July 1987, Siddiqui attempted to file an application for legalization, but the Immigration and Naturalization Service ("INS") refused to allow him to submit it as a result of a brief trip to Pakistan that he had taken.[1]

This INS practice, known as "front-desking," was the subject of a class action suit. *See generally Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 45-49 (1993); *Catholic Soc. Servs., Inc. v. Meese*, 685 F. Supp. 1149 (E.D. Cal. 1988). Although the IRCA provides that "[a]n alien shall not be considered to have failed to maintain continuous physical presence . . . by virtue of brief, casual or innocent absences from the United States,'' 8 U.S.C. § 1255a(a)(3)(B),

---

[1] INS was abolished on March 1, 2003, and several of its functions were transferred from the Department of Justice ("DOJ") to the Department of Homeland Security ("DHS"). *See* Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (codified as amended at 6 U.S.C. §§ 101-612). USCIS, an agency situated within DHS, now handles legalization applications, with the AAO conducting the appeals. *See* 8 C.F.R. § 245a.2. Removal proceedings remain within the DOJ in the Executive Office of Immigration Review. Immigration judges ("IJs") conduct the initial adjudication, subject to review by the Board of Immigration Appeals ("BIA"). *See* 8 C.F.R. §§ 1003.1, 1003.10.

INS frequently refused in the late 1980s to accept legaliza-
tion applications from people, like Siddiqui, who had
taken short trips outside the country. The district court
held that INS's regulation, which narrowly defined a
"brief, casual and innocent" absence as "a departure
authorized by the Service . . . for legitimate emergency or
humanitarian purposes," 8 C.F.R. § 245a.1(g) (1989), was
invalid and unenforceable as "inconsistent with the
statutory scheme." *Catholic Soc. Servs., Inc.*, 685 F. Supp. at
1159-60. The district court required INS to accept late
applications for amnesty from applicants who had been
subjected to this policy. *See Catholic Soc. Servs., Inc.*, 509
U.S. at 47-49. By virtue of his membership in the *Catholic
Social Services* ("*CSS*") class, Siddiqui filed a Form I-687
application for temporary residence in 1990. INS issued
a work authorization document to Siddiqui but did not
adjudicate his application while the *CSS* litigation was
ongoing.

The *CSS* suit was not resolved until 2004, when DHS
entered into a settlement in which it agreed not only
to adjudicate amnesty applications from front-desked
applicants but also to adjudicate them in accordance
with the law as it existed in 1987-1988 (when the applica-
tions were wrongfully rejected). *See* Settlement Agree-
ment, *Catholic Soc. Servs., Inc. v. Ridge*, No. S-86-1343-LKK
(E.D. Cal.), *available at* http://www.uscis.gov/files/article/
CSS_Settlement.pdf. Siddiqui filed a second Form I-687
application in 2005 after the final settlement in the
*CSS* suit.

As an outgrowth of the *CSS* suit and two other class
actions, Congress enacted the Legal Immigration Family

Equity ("LIFE") Act, Pub. L. No. 106-553, 114 Stat. 2762 (2000), to provide a faster path to lawful status for amnesty applicants. The LIFE Act generally requires applicants to be members of one of these class actions and to establish continuous residence in the United States from 1982 to 1988. *See* LIFE Act § 1104. In 2002, Siddiqui filed a Form I-485 application for permanent residence pursuant to the LIFE Act.

While his initial amnesty application was pending, Siddiqui settled in Granite City, Illinois where he worked as a truck driver. In 1991, Siddiqui was arrested for possession of a hunting knife. He was found guilty on December 10, 1991 in the Circuit Court of St. Louis of Unlawful Use of a Weapon, Carrying a Concealed Weapon under Missouri Stat. 571.030.1(1), a Class D felony. The court entered this conviction on February 25, 1992. The court suspended the imposition of a sentence and mandated three years' probation, which Siddiqui completed successfully. Siddiqui moved to set aside his conviction, but the court concluded that it lacked jurisdiction because he no longer had a record of a conviction.

As a truck driver, Siddiqui frequently drove a route between Ontario and Detroit or Buffalo. When he was returning from Canada on April 19, 1995, he was questioned by an INS officer who claims that Siddiqui presented himself as a U.S. citizen. Another INS officer examined Siddiqui's Illinois driver's license and voter registration. The version of the voter registration form filed with Madison County states that Siddiqui is a

naturalized citizen and is signed by Siddiqui under an attestation to being a U.S. citizen. The original version of the form, which Siddiqui retained, states "Kotri Sind" (Pakistan) as his place of birth and does not contain the handwritten text stating that he is a naturalized citizen, but does contain the signed attestation. According to Siddiqui, he never stated that he was a U.S. citizen (to the INS officer or on the voter registration form), and he claims that he did not read the form carefully before signing it. On the basis of this border incident, Siddiqui was not permitted to reenter the United States.

INS charged Siddiqui with attempting to enter the country without proper documentation and by falsely claiming to be a U.S. citizen. INS commenced deportation proceedings by filing an Order to Show Cause on February 28, 1997. Although INS was aware that Siddiqui had a pending I-687 amnesty application, INS counsel argued that this did not provide any basis for staying or terminating the deportation proceeding. The IJ agreed and issued a deportation order on December 5, 2001.

Siddiqui appealed to the BIA and stated that he was seeking legalization pursuant to his *CSS* class membership. The BIA dismissed his appeal on June 25, 2003. Siddiqui next filed a petition for review, alleging that the IJ and the BIA erred by failing to terminate or stay his deportation proceedings because he was eligible for legalization. *Siddiqui v. Ashcroft*, No. 03-3998 (6th Cir. Dec. 16, 2004). The Sixth Circuit held that Siddiqui was

barred from obtaining judicial review due to his failure to make this argument to the BIA.

On November 10, 2005, Siddiqui voluntarily appeared in response to a DHS notice and was detained for four years while DHS continued to review his amnesty applications. The Chicago USCIS field office director denied Siddiqui's 1990 I-687 amnesty application in December 2007 and denied his application under the LIFE Act in January 2008. In response to Siddiqui's appeal of the I-687 denial, USCIS reopened the application, consolidated it with the 2005 Form I-687 application, and reissued its denial in May 2009.

Siddiqui appealed these denials to the AAO. The AAO dismissed Siddiqui's appeals on September 3, 2009, then sua sponte withdrew and reconsidered its decisions, and finally dismissed them again on November 5, 2009 after a de novo review of the case and the evidence. Agreeing with the USCIS director's decisions, the AAO concluded that Siddiqui was ineligible for amnesty due to his failure to prove continuous residence in the United States for the requisite period and due to his felony conviction. In spite of the *CSS* settlement agreement, the AAO applied the more expansive definition of "conviction," established and made retroactive by section 322 of IIRIRA.

Siddiqui then filed two pro se petitions before this court, seeking review of his two amnesty denials and requesting stay of removal: No. 09-3912 (appealing the LIFE Act denial) and No. 10-1282 (appealing the Form I-687 denial). We consolidated these cases on

April 20, 2010 and ordered the government to respond to a jurisdictional memorandum, which had been filed by Siddiqui in response to the government's motion to dismiss for lack of jurisdiction. On May 12, 2010, the government filed a second motion to dismiss.

Judicial review of amnesty denials is only available as part of the judicial review of an order of deportation. *See* 8 U.S.C. § 1105a (1996); 8 U.S.C. § 1255a(f)(4)(A). Thus, to facilitate judicial review of the AAO's decisions, the parties jointly filed a motion on May 21, 2010, asking the BIA to reissue its June 25, 2003 deportation decision. The BIA granted this motion and reissued the decision on August 25, 2010. Siddiqui then filed a timely appeal (No. 10-3221) of the BIA's most recent decision. The present action represents a consolidation of these three petitions.

## II. Discussion

We have jurisdiction to review both the deportation decision and the amnesty denials. Our jurisdiction to review the BIA's deportation decision arises from the transitional rules of IIRIRA, § 309(c)(1), because the proceedings were commenced by an order to show cause issued prior to April 1, 1997, IIRIRA's effective date. Our jurisdiction to review the AAO's amnesty denials arises indirectly through our jurisdiction to review the deportation decision. *See* 8 U.S.C. § 1255a(f)(4)(A) ("There shall be judicial review of such a denial only in the judicial review of an order of deportation under section 1105a of this title (as in effect before October 1, 1996)."). The

BIA's reissuance of its deportation decision resolved many of the jurisdictional complexities of this case and brings the removal order and the legalization decisions properly before us.

## A. Continuous Unlawful Residence in the United States

The AAO denied both of Siddiqui's legalization applications on the same two grounds: (1) failure to establish continuous residence in the United States, and (2) conviction of a felony. Because either ground would have been sufficient to deny the applications, we must conclude that the AAO erred as to both conclusions in order to grant Siddiqui's petition. We begin by addressing the first ground.

### 1. Standard for Establishing Continuous Unlawful Residence

Judicial review of the denial of an application for legalization shall be based solely upon the administrative record established at the time of the review by the appellate authority and the findings of fact and determinations contained in such record shall be conclusive unless the applicant can establish abuse of discretion or that the findings are directly contrary to clear and convincing facts contained in the record considered as a whole.

8 U.S.C. § 1255a(f)(4)(B). This standard of review has been characterized as "very narrow." *Ruginski v. INS*,

942 F.2d 13, 16-17 (1st Cir. 1991) ("[I]t is not sufficient for the applicant simply to show that different conclusions might possibly be drawn from the evidence submitted in support of the application."); *see also Moosa v. INS*, 171 F.3d 994, 1004 (5th Cir. 1999).[2] Given Siddiqui's status as a *CSS* class member, we also consider pre-IIRIRA law, which required decisions to be "supported by reasonable, substantial and probative evidence on the record considered as a whole." *See* 8 U.S.C. § 1105a(a)(4) (1996); *see also Toptchev v. INS*, 295 F.3d 714, 720 (7th Cir. 2002). Under either deferential standard, we conclude that the AAO abused its discretion by disregarding the detailed evidence submitted by Siddiqui. *Cf. Mema v. Gonzales*, 474 F.3d 412, 419 (7th Cir. 2007) ("An applicant for asylum is entitled to a reasoned analysis, not one which wholly disregards relevant, probative evidence."); *Zhong v. U.S. Dep't of Justice*, 480 F.3d 104, 117 (2d Cir. 2007) (construing an IJ's use of an "inappropriately stringent standard" as a legal error).

Siddiqui filed amnesty applications under two different statutory schemes, which both require the same burden of proof to establish virtually the same nexus of facts. Siddiqui must establish by a preponderance of the evidence that he entered the United States before January 1, 1982 and that he resided here continuously in

---

[2] Both parties cite to precedents that we have set forth under related immigration laws with differing standards of review. We take these into account yet remain mindful that they are not binding here.

an unlawful status since 1982 and until May 4, 1988 (pursuant to the LIFE Act) or until the date that he attempted to file his application (pursuant to the *CSS* settlement). *See* 8 U.S.C. § 1255a(a)(2)(A); LIFE Act § 1104(c)(2)(B)(I). He must also establish that he has been physically present in the country since November 6, 1986, *see* 8 U.S.C. § 1255a(a)(3); LIFE § 1104(c)(2)(C), and that he applied during the application period, *see* 8 U.S.C. § 1255a(a)(1); LIFE § 1104(c)(2)(A). An applicant who meets this burden is entitled to amnesty as a matter of law. *See* 8 U.S.C. § 1255a(a); LIFE § 1104(c)(2).

The preponderance of the evidence standard requires the trier of fact "to believe that the existence of a fact is more probable than its nonexistence" and to find the evidence "to be sufficiently reliable and sufficiently probative to demonstrate the truth of the asserted proposition with the requisite degree of certainty." *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for So. Cal.*, 508 U.S. 602, 622 (1993). The evidence must demonstrate that the applicant's claim is "probably true," given the factual circumstances of the case. *Matter of E-M-*, 20 I. & N. Dec. 77, 79-80 (Comm'r 1989). "The inference to be drawn from the documentation provided shall depend on the extent of the documentation, its credibility and amenability to verification . . . ." 8 C.F.R. §§ 245a.12(e), 245a.2(d)(5). Although the applicant must provide evidence other than his own testimony, *see* 8 C.F.R. §§ 245a.12(f), 245a.2(d)(6), an applicant may satisfy his burden of proof where there is no adverse information by submitting affidavits that "are credible and verifiable [and] are sufficient to establish the facts

at issue." Memorandum of David W. Wolfe at 2 (Feb. 13, 1989) (hereinafter "Wolfe Memo"), *reprinted in* 66 Interpreter Releases 12 (1989).

Congress intended for the legalization scheme to be "implemented in a liberal and generous fashion" without "unnecessarily rigid demands for proof of eligibility." H.R. REP. NO. 99-682, at 72-73 (1986). According to INS guidance, "[i]t is important to recognize that not every legalization applicant will be able to produce full documentary proof of their eligibility and that the regulations provide a variety of ways in which applicants may satisfy the requirements." Wolfe Memo at 3; *see also* 8 C.F.R. § 245a.2(d)(3). Siddiqui's status as a *CSS* class member entitles him to even greater lenity as DHS agreed to "take into account the passage of time and attendant difficulties in obtaining corroborative documentation of unlawful residence." *CSS* Settlement ¶ 11.

### 2. Application

Siddiqui's claims regarding his residence, employment, and organizational affiliations vary slightly in the different applications that he filed. Siddiqui claims that he entered the United States as a visitor some time prior to April 1980. He claims that he lived in Dallas, Texas from 1979 to 1980, in St. Louis, Missouri from 1980 to 1989, and in House Springs, Missouri and Granite City, Illinois thereafter.

Siddiqui submitted documents from thirteen individuals to establish his continuous residence. Five affida-

vits are from Siddiqui's siblings, who are U.S. permanent residents. Muzaffaruddin Syed Khaja submitted one declaration and three affidavits, asserting that he met Siddiqui in 1980, that Siddiqui lived with him in St. Louis from January 1982 to July 1985, and that Siddiqui worked as a carpenter, handyman, and car mechanic. Childhood friend Shahid Bari states that Siddiqui left Pakistan at least five years before Bari came to the United States in 1986. Bari also submits that they became reacquainted in 1986, lived together for part of 1987, and that Siddiqui worked at several convenience stores and a gas station. Sabz Ali states that he met Siddiqui in 1985 and that Siddiqui resided in St. Louis from 1985 to May 1988. Dr. Mazhar Lakho wrote that Siddiqui lived in St. Louis starting in 1981, and Cletus Heisserer wrote that Siddiqui resided continuously in the United States from the summer of 1981 through June 1987. Younas Ahmed Khan, a friend and roommate, stated that Siddiqui lived in Dallas from December 1979 through April 1980 and in St. Louis from April 1980 through 1989. Sayed Zaidi submitted an affidavit identical to Khan's. Michael Thompson wrote that Siddiqui has been a good friend of his family since the 1980s. Dr. Abid Nisar wrote that he knew Siddiqui when he lived in Dallas and that he employed Siddiqui as a maintenance worker in St. Louis in 1982.

The AAO reviewed the affidavits and found them to have little probative value:

> None of the witness statements provide concrete information, specific to the applicant and generated

by the asserted associations with him, which
would reflect and corroborate the extent of those
associations and demonstrate that they were a suffi-
cient basis for reliable knowledge about the ap-
plicant's residence during the time addressed in the
affidavits. To be considered probative and credible,
witness affidavits must do more than simply state
that an affiant knows an applicant and that the ap-
plicant has lived in the United States for a specific
time period. Their content must include sufficient
detail from a claimed relationship to indicate that
the relationship probably did exist and that the
witness does, by virtue of that relationship, have
knowledge of the facts alleged.

This language appears verbatim in both decisions with
no further analysis of the affidavits. In its I-687 decision,
the AAO merely listed the names of the affiants; in its
LIFE Act decision, the AAO did not even do that.
Despite acknowledging that the affiants state that they
have known Siddiqui for several years and attest to his
physical presence, the AAO summarily concluded that
the affidavits "fail . . . to establish the applicant's con-
tinuous unlawful residence in the United States for
the duration of the requisite period." The AAO broadly
stated that, "individually and together, the witness state-
ments do not indicate that their assertions are probably
true. Therefore, they have little probative value." In
reaching this conclusion, the AAO did not reference any
of the affidavits in particular or explain why it believed
that the assertions were probably not true.

Siddiqui also presented an official letter from Moham-med Salim, chairman of Community Relations of the Islamic Center of Greater St. Louis, stating that Siddiqui has been an active member since 1980. This type of evidence is expressly recognized as relevant by 8 C.F.R. § 245a.2(d)(3)(v). The AAO dismissed this letter as "lack[ing] most of the information required and therefore, has little probative value."

Additionally, Siddiqui presented W-2 wage statements for 1985, 1986, and 1988. He also submitted a 1099-MISC for 1988 and Social Security statements for 1986 and 1988. The AAO disregarded this evidence because it showed only "sporadic earnings during the requisite period." In its LIFE Act decision, the AAO acknowledged that the IRS and Social Security documents "provide some evidence" but noted that they were not sufficient to establish that "the applicant resided continuously for the entire relevant period."

Siddiqui argues that the AAO offers only conclusory, boilerplate assessments and fails to provide any individualized analysis of the detailed evidence that he presented. We agree. An agency abuses its discretion when it fails to "to issue opinions with rational explanations and adequate analysis of the record." *Gebreeyesus v. Gonzales*, 482 F.3d 952, 954 (7th Cir. 2007) (quoting *Kay v. Ashcroft*, 387 F.3d 664, 674 (7th Cir. 2004)); *see also Rhoa-Zamora v. INS*, 971 F.2d 26, 34, 36 (7th Cir. 1992) (requiring "careful, individualized review of the evidence"). Given this lack of analysis, we are unable "to perceive that [the agency] has heard and thought and not

merely reacted." *Gebreeyesus*, 482 F.3d at 954 (quoting *Mansour v. INS*, 230 F.3d 902, 908 (7th Cir. 2000)). Where, as here, the agency uses only generalized language to reject the evidence, we cannot conclude that the decisions rest on proper grounds. *See Punzio v. Astrue*, 630 F.3d 704, 709 (7th Cir. 2011) (reversing agency's denial because "to read the ALJ's boilerplate credibility assessment is enough to know that it is inadequate and not supported by substantial evidence").

Siddiqui points out that the boilerplate dismissal has been used verbatim in at least 536 decisions.[3] The AAO claims that the affidavits fail to indicate that they are "probably true," yet—with the exception of the Islamic Center's letter—the AAO cites no specific deficiencies. Contrary to the AAO's determination, several affidavits provide "concrete information" that demonstrate a "sufficient basis for reliable knowledge about the applicant's residence." At minimum, the detailed assertions offered by Khaja, Ali, and Bari warrant discussion by the AAO and an explanation of their deficiencies. Khaja submitted four documents, and Ali listed specific locations where he had met up with Siddiqui. The AAO's claim that it has reviewed every document is wholly unpersuasive in light of the absence of any particularized analysis of these documents. *See Escobar v. Holder*, 657 F.3d 537, 544 (7th Cir. 2011) (noting that, despite deferential review, the BIA "may not simply overlook

---

[3] Worse yet, the AAO included the same boilerplate assessment twice in the span of two pages in its LIFE Act decision.

evidence in the record that supports the applicant's case" (citation omitted)).

The government admitted at oral argument that the AAO's decisions are "not a complete statement," but this concession understates the issue. The AAO's discussion of the affidavits, which form the bulk of the evidence, does not give any indication that the agency conducted an adequate and individualized analysis of the record. In defense of the boilerplate text, the government argues that the AAO was simply reciting the governing law, which applies in hundreds of cases every year.[4] The boilerplate text, however, does not merely recite a legal standard but phrases it in a way that preordains the agency's conclusion. In any event, the recitation of governing law does not excuse the AAO from its obligation to apply the law to the facts of each case.

Although the AAO did address the letter from the Islamic Center, the AAO did not explain what the letter was missing or how this affected the probative weight. The government points out that the letter fails to identify Siddiqui's address, the exact dates of his membership, and the origin of the information being attested to. Yet the letter still attests to Siddiqui's active participa-

---

[4] The government appended to its brief a chart indicating the number and status of I-687 applications filed pursuant to two settlement agreements. Because we rule in favor of Siddiqui, we need not rule on Siddiqui's motion to strike this information. *See Sears, Roebuck & Co. v. Murry Ohio Mfg. Co.*, 949 F.2d 226, 227 n.1 (7th Cir. 1991).

tion since 1980. The absence of some of the elements enumerated in 8 C.F.R. § 245a.2(d)(3)(v) does diminish the probative value, but it does not eliminate it entirely—particularly where evidence of Siddiqui's residence is provided by other affiants and where Congress, INS, and the *CSS* settlement all urge flexibility.

In its LIFE Act decision, the AAO did acknowledge that the Social Security and wage statements provide "some evidence" of Siddiqui's residence. This type of evidence is designated as an acceptable form of proof. *See* 8 C.F.R. § 245a.2(d)(3). We recognize that Siddiqui's case would be more straightforward if he provided objective evidence for every year during the relevant period; however, the AAO, as well as this court, must consider the difficulty of supplying official evidence to corroborate continuous unlawful residence in the United States. *See* H.R. REP. NO. 99-682, at 73 ("[M]any undocumented aliens have been clandestinely employed and thus may not have the usual trail of records.").

The liberal standard that the AAO articulated as governing its review does not comport with the actual standard it applied. For example, the AAO recognized that "the director can still have doubts but, nevertheless, the applicant can establish eligibility" and that it is appropriate for the director to "either request additional evidence or, if that doubt leads the director to believe that the claim is probably not true, deny the application." *See Matter of E-M-*, 20 I. & N. Dec. at 79. The AAO never identified the source of its doubt or why it led to the

conclusion that Siddiqui's claims were "probably not true." Equally troubling, the AAO did not request additional evidence or document any attempts to verify the affidavits, even though they were easily verifiable. *See* Wolfe Memo at 2 (requiring documentation of "attempts to verify the authenticity of information submitted"). The affiants had provided their contact information and indicated their willingness to testify.

The government attempts to defend the AAO's decision by pointing to a number of holes in Siddiqui's evidence, including no proof of earnings for 1987 and no reference in the affidavits to Siddiqui's young age when the affiants met him. The government also notes that Siddiqui could not remember his street address in Dallas or when his visa had expired. Siddiqui appropriately criticizes these defenses as "appellate counsel's post hoc rationalizations for agency action." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168-69 (1962); *see also N.L.R.B v. Indianapolis Mack Sales & Serv. Inc.*, 802 F.2d 280, 285 (7th Cir. 1986) ("The Board's appellate counsel cannot fill in the holes in the agency's decision . . . ." ). We agree with the government that the siblings' affidavits are not very helpful as they speak to Siddiqui's character rather than his residence, and we further agree that some of the affidavits contain only generic language. Nevertheless, these shortcomings were not mentioned by the AAO, and its decision "stands or falls on its express findings and reasoning*." Indianapolis Mack Sales & Serv. Inc.*, 802 F.2d at 285.

We conclude that the AAO abused its discretion by failing to conduct an individualized analysis and by disregarding probative evidence. Its boilerplate determinations are contrary to the detailed evidence in the record. Although the AAO is not required to "write an exegesis on every contention an applicant raises," *Kiorkis v. Holder*, 634 F.3d 924, 928-29 (7th Cir. 2011) (quoting *Dobrota v. INS*, 195 F.3d 970, 974 (7th Cir. 1999)), it has a duty to conduct an individualized review and to explain the reasons for its conclusions in each case. Because we also find that Siddiqui's conviction did not warrant the AAO's denial of his legalization applications, we vacate the BIA's deportation order and remand so that the AAO can conduct an individualized analysis of the evidence.

## B.   Application of IIRIRA's Definition of "Conviction"

The AAO also denied Siddiqui's legalization applications on the basis of his 1991 felony conviction for unlawful use of a weapon. The AAO observed that IIRIRA broadened the definition of "conviction" for immigration purposes, *see* IIRIRA § 322(a) (codified at 8 U.S.C. § 1101(a)(48)), and that this definition applies to convictions entered "before, on, or after the date of the enactment," *see* IIRIRA § 322(c). The AAO held that, given his conviction, Siddiqui was neither eligible for temporary resident status, *see* 8 C.F.R. § 245a.2(c)(1), nor permanent resident status, *see* 8 C.F.R. § 245a.11(d)(1). The AAO made no reference to the *CSS* settlement, in which DHS agreed to "adjudicate each application for

temporary residence filed on Form I-687 in accordance with the provisions of section 245A of the Immigration and Nationality Act, 8 U.S.C. § 1255a, regulations, and administrative and judicial precedents the INS followed in adjudicating I-687 applications timely filed during the IRCA application period." *CSS* Settlement ¶ 11.

Siddiqui argues that, notwithstanding the retroactive nature of IIRIRA, its definition of "conviction" should not apply to him. He argues that his legalization applications should be adjudicated under the law in existence in 1987-1988, when his application was wrongfully front-desked. Siddiqui asserts that his suspended sentence does not qualify as a conviction under pre-IIRIRA law and therefore does not make him ineligible for legalization. The AAO summarily rejected this argument as "without merit," but we accept Siddiqui's argument. We hold that Congress did not express its clear intent to apply the new definition to individuals such as Siddiqui, and therefore the government is bound by the terms of the *CSS* settlement and must apply pre-IIRIRA law.

### 1. *Landgraf* Analysis

Whether a statutory provision applies retroactively is a legal question, which we review de novo. *See Faiz-Mohammad v. Ashcroft*, 395 F.3d 799, 801 (7th Cir. 2005). We follow the guidelines established by the Supreme Court in *Landgraf v. USI Film Products*, 511 U.S. 244 (1994), to determine whether a statutory provision is retroactive. First, we must ascertain whether Congress has spoken with the "requisite clarity" as to

whether the statute should apply retroactively. *INS v. St. Cyr*, 533 U.S. 289, 316 (2001); *see also Landgraf*, 511 U.S. at 272-73 ("Requiring clear intent assures that Congress itself has affirmatively considered the potential unfairness of retroactive application and determined that it is an acceptable price to pay for the countervailing benefits."). If the intent is clear, "the court and the agency must give effect to the unambiguously expressed will of Congress." *Flores-Leon v. INS*, 272 F.3d 433, 438 (7th Cir. 2001). Second, if the statute is silent as to whether a particular provision is retroactive, we must consider whether applying the statutory provision retroactively "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Landgraf*, 511 U.S. at 280; *see also Jideonwo v. INS*, 224 F.3d 692, 698 (7th Cir. 2000) ("[W]hen congressional intent is unclear, we consider whether the statute 'attaches new legal consequences to events completed before its enactment.'" (quoting *Landgraf*, 511 U.S. at 269-70)). "[B]y deferring to Congress when it clearly expresses its intent that a statute is retroactive and applying a presumption against retroactivity when congressional intent is ambiguous," *Landgraf*'s two-pronged approach reconciles the conflicting principles that a court apply the law existing at the time of its decision and that a court assess the legal effect of conduct under the law existing when the conduct occurred. *Labojewski v. Gonzales*, 407 F.3d 814, 818 (7th Cir. 2005).

Section 322 of IIRIRA sets forth the new definition of conviction, *see* IIRIRA § 322(a), and states that "[t]he

amendments made by subsection (a) shall apply to convictions and sentences entered *before, on, or after* the date of the enactment of this Act." IIRIRA § 322(c) (emphasis added). We have previously acknowledged that this language evinces Congress's clear intent that the definition of conviction be applied retroactively. *See Montenegro v. Ashcroft*, 355 F.3d 1035, 1037-38 (7th Cir. 2004); *see also St. Cyr*, 533 U.S. at 319 n.43. But our analysis does not end here because, even though Congress has expressed its intent to apply section 322(a) retroactively in general, it does not necessarily follow that Congress has expressed its intent to apply the provision retroactively in this situation.

Siddiqui advances an argument along these lines by arguing that section 322(c) speaks to retroactive application in deportation proceedings but is silent as to its application in legalization proceedings. Siddiqui points to excerpts from the legislative history of IIRIRA that articulate Congress's aim to make the deportation of criminal aliens easier and faster. *See* S. REP. NO. 104-249, at 2 (1996) (referring to "expediting the removal of excludable and deportable aliens, especially criminal aliens" as one of the purposes of the Act). He also argues that Congress expressed no intent to apply the new definition to offenses that carry no deportation consequences.

We are not persuaded by these arguments. Applying the new definition in legalization proceedings can indirectly achieve Congress's objective by removing a common defense to deportation. By redefining convic-

tion, Congress has thus redefined the category of offenses that can lead to deportation. Moreover, the structure of IIRIRA belies Siddiqui's contention that the definition applies retroactively only to deportation proceedings. The amended definition of "conviction" is codified in 8 U.S.C. § 1101(a), which provides a list of definitions that govern the entire chapter. The chapter, labeled "Immigration and Nationality," encompasses a broad range of provisions related to such topics as admission qualifications, removal, adjustment of status, and naturalization. Furthermore, IIRIRA subsection 322(a)(2) identifies two conforming amendments—of which one modifies a provision about visa eligibility. Thus, by its own terms, IIRIRA's new definition of conviction does not apply solely to deportation. Other circuits have applied the definition retroactively in legalization proceedings, and we find nothing to lead us to a different result here. *See, e.g.*, *Moosa*, 171 F.3d at 997-98, 1005-06; *cf. Puella v. Bureau of Citizenship & Immigration Servs.*, 511 F.3d 324, 331-32 (2d Cir. 2007) (applying section 322 in a naturalization proceeding).

Although we conclude that Congress expressed its intent for section 322 to apply retroactively in legalization proceedings, we are unable to conclude that Congress also expressed its intent to apply section 322 retroactively to people afforded *nunc pro tunc* relief as a result of DHS's wrongdoing.[5] The Supreme Court has

---

[5] *Nunc pro tunc*, a Latin phrase meaning "now for then," "refers to the power of a court to treat something done

(continued...)

referred to the standard for finding unambiguous congressional intent as "demanding" and requiring "unmistakable clarity." *St. Cyr*, 533 U.S. at 316, 318; *see also Lindh v. Murphy*, 521 U.S. 320, 328 n.4 (1997) (noting that the language must be "so clear that it could sustain only one interpretation"). We recognize that DHS had not yet entered into the *CSS* settlement when Congress enacted IIRIRA, and therefore Congress did not expressly carve the *CSS* class out of the reach of this provision. Yet Congress's intentions in enacting this retroactive provision do not comport with its application to people in Siddiqui's position—namely, people who are entitled to have their legalization applications adjudicated under pre-IIRIRA law by virtue of agency wrongdoing and a settlement entered into by DHS and approved by a federal court. Indeed, the very fact that DHS agreed to apply pre-IIRIRA law in the *CSS* settlement demonstrates that DHS construed IIRIRA's retroactivity provision as silent with respect to the class of individuals harmed by DHS's front-desking practice.[6]

---

[5] (...continued)

now–typically a court order–as effective as of an earlier date." *Gutierrez-Castillo v. Holder*, 568 F.3d 256, 261 (1st Cir. 2009).

[6] After briefing was completed, Siddiqui submitted a Rule 28(j) Notice of Supplemental Authorities, arguing that res judicata, based on the *CSS* settlement, bars DHS from applying IIRIRA's definition of conviction to him. Rule 28(j) does not provide a second forum for raising new or different arguments. *See Spiegla v. Hull*, 481 F.3d 961, 965 (7th Cir. 2007). Although

(continued...)

DHS cannot, without any explanation, renege on its legal commitment by reversing its interpretation of this statutory provision. The AAO's decision simply quotes section 322(c) and cites to *Matter of Punu*, 22 I. & N. Dec. 224, 1998 WL 546634 (BIA 1998)[7] for its conclusion that IIRIRA's definition applies to Siddiqui. But neither IIRIRA nor *Matter of Punu* discuss the applicability of the retroactivity provision to those expressly granted *nunc pro tunc* relief due to the agency's wrongdoing. Therefore, as to *Landgraf*'s first inquiry, we conclude that the statutory provision is silent.

Because we find no clear indication of Congress's intent, we turn to the second step of the *Landgraf* analysis. *See Landgraf*, 511 U.S. at 280; *Faiz-Mohammad*, 395 F.3d at 804. We must "determine whether a statute operates retroactively in the case before the court for purposes of triggering the presumption against retroactive application." *Labojewski*, 407 F.3d at 819. To do so, we must consider whether section 322 "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with

---

[6]  (...continued)

Siddiqui advanced several arguments based on the *CSS* settlement in his briefs, he did not make a res judicata argument. Based on our determinations on the merits of this case, we find it unnecessary to address this issue.

[7]  The AAO actually cited to *Matter of Puna*, 22 I. & N. Dec. 224 (BIA 1996), a case that we are unable to locate and presume to be a citation error.

respect to transactions already completed." *Landgraf*, 511 U.S. at 280. We also look to "familiar considerations of fair notice, reasonable reliance, and settled expectations," *id.* at 270, and to "the longstanding principle of construing any lingering ambiguities in deportation statutes in favor of the alien," *INS v. Cardoza-Fonseca*, 480 U.S. 421, 449 (1987).

Section 322 does attach new legal consequences to events completed before its enactment: Siddiqui attempted to apply for legalization in 1987 but INS refused to accept his application. Siddiqui was then convicted of a crime in 1991 that did not qualify as a deportable offense under then-existing laws. The agency's wrongdoing, coupled with the retroactive application of the new definition, impairs rights that Siddiqui possessed when he applied for adjustment of status. *Cf. Labojewski*, 407 F.3d at 822; *Arevalo v. Ashcroft*, 344 F.3d 1, 14-15 (1st Cir. 2003) (holding that the application of an IIRIRA provision to petitioner, who had applied prior to IIRIRA's effective date, would "have an unfairly retroactive effect on the petitioner's rights and expectations").

We therefore apply the presumption against retroactivity and construe the new definition of conviction as inapplicable to Siddiqui due to the absence of Congress's clear indication. *See Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 37-38 (2006). Congress has the authority to redefine convictions and to retroactively apply the definition, but "in legislating retroactively, Congress must make its intention plain." *St. Cyr*, 533 U.S. at 325 n.55. Congress did not make its intention plain that IIRIRA's expanded

definition of conviction would apply to individuals entitled to have their applications adjudicated under pre-IIRIRA law due to the government's refusal to accept their applications. Because we can find no indication that Congress considered the question of whether to apply section 322 retroactively to aliens who are afforded *nunc pro tunc* relief, we hold that the AAO is bound by the terms of the *CSS* settlement to adjudicate Siddiqui's application under the laws as they existed when INS unlawfully refused to accept his legalization application.[8]

---

[8] In so holding, we decline to reach the same result as *Gutierrez-Castillo v. Holder*, a First Circuit case that concluded that granting *nunc pro nunc* relief from the retroactive application of IIRIRA's definition of "aggravated felony" would conflict with the text and congressional intent. 568 F.3d 256, 261-62 (1st Cir. 2009). The First Circuit also found *nunc pro tunc* relief inappropriate because the agency had not erred and had in fact delayed the proceedings for Gutierrez's benefit. *See id.* at 262. The court labeled it "sheer bad luck" that IIRIRA was enacted before Gutierrez's hearing. *Id.* Siddiqui's situation is distinguishable because the agency's wrongdoing caused his amnesty application not to be adjudicated in 1987 and not to be adjudicated from 1988 to 2004 during the litigation about this wrongdoing. We are not confronted with the issue that faced the First Circuit: whether an agency or court can grant *nunc pro tunc* relief to shield a petitioner from the regular application of a retroactive statute. We are instead confronted with the unique situation in which the agency's wrongful actions prevented the application from being adjudicated under pre-IIRIRA law. We conclude that

(continued...)

## 2. Application

Prior to IIRIRA, there was no federal statute defining "conviction" for immigration purposes. Instead, the BIA generally relied on the state law effects of an offense to determine whether it qualified as a conviction. *See Matter of Ozkok*, 19 I. & N. Dec. 546, 549-50, 1988 WL 235459 (BIA 1988). But the BIA concluded in 1988 that this approach was unduly deferential to state definitions, allowing aliens to escape the immigration consequences intended by Congress. *Id.* In *Matter of Ozkok*, the BIA adopted a broader test for definition conviction, which established, *inter alia*, that a conviction exists for immigration purposes when "a judgment or adjudication of guilt may be entered if the person violates the terms of his probation or fails to comply with the requirements of the court's order, without availability of further proceedings regarding the person's guilt or innocence of the original charge." *Id.* at 551-52. According to INS, for deferred adjudications of guilt, "the

---

[8] (...continued)

Congress did not speak to this situation and therefore *nunc pro tunc* relief is not barred. DHS agreed to provide this, a court approved this, and we hold DHS (through the AAO) to this pledge.

Moreover, unlike the First Circuit whose precedent does not support a constitutional argument against retroactive application of the statute, *see Gutierrez-Castillo*, 568 F.3d at 261 n.4, we have recognized that the retroactive application of a statute redefining conviction can violate due process. *See Batanic v. INS*, 12 F.3d 662, 667-68 (7th Cir. 1993).

state authority under which the court acted must be reviewed, and the test enunciated in *Ozkok* . . . must be applied." Memorandum of Richard Norton (Apr. 22, 1987) (hereinafter "Norton Memo"), *reprinted in* 65 Interpreter Releases 16, App'x I (1988). The *Ozkok* test was binding on all DHS officers and employees, *see* 8 C.F.R. § 1003.1(g), and applied during the amnesty application period, *see* Norton Memo.

Under Missouri law, a court may suspend the imposition of sentence. MO. REV. ST. § 557.011.2(3). An appeal is only available if a probation violation occurs. *See Hoskins v. State*, 329 S.W.3d 695, 698 n.3 (Mo. 2010). If none occurs, there is no final judgment to review and no criminal conviction on the offender's record. *See id.* Siddiqui received a suspended imposition of sentence and completed probation without incident. Consequently, he could not appeal the finding of guilt, even though there were "further proceedings" available as to his "guilt or innocence of the original charge." *Ozkok*, 19 I. & N. Dec. at 552. Therefore, Siddiqui's offense does not qualify as a conviction for immigration purposes under *Ozkok*, the law that existed during the IRCA application period.

Congress did not believe that *Ozkok* went far enough to expand the scope of "conviction." *See* H.R. REP. NO. 104-828; *see also Francis v. Gonzales*, 442 F.3d 131, 140-41 (2d Cir. 2006). In enacting IIRIRA in 1996, Congress further broadened the definition by expressly defining "conviction" for immigration purposes as:

> a formal judgment of guilt of the alien entered by a court or, if adjudication of guilt has been withheld, where—

(I) a judge or jury has found the alien guilty . . . , and

(ii) the judge has ordered some form of punishment, penalty, or restraint on the alien's liberty to be imposed.

IIRIRA § 322(a) (codified at 8 U.S.C. § 1101(a)(48)(A)). We have recognized that IIRIRA "eliminated the finality requirement for a conviction" and instead "treats an alien as 'convicted' once a court enters a formal judgment of guilt." *Montenegro*, 355 F.3d at 1037-38. Thus, Siddiqui's offense falls within IIRIRA's definition of "conviction."

Because section 322(c) operates to impair rights that Siddiqui possessed when he acted and because Congress did not plainly express its intention to include individuals entitled to *nunc pro tunc* relief under the retroactive sweep of section 322, IIRIRA's new definition of conviction may not be applied retroactively to Siddiqui. Under the pre-IIRIRA definition of conviction, Siddiqui's offense does not render him ineligible for amnesty. Therefore, the AAO is not permitted to rely on the weapons offense as a ground for denying either of Siddiqui's legalization applications.

This conclusion is supported by our holding in *Batanic* that the petitioner "must, consistent with due process, be able to apply for asylum *nunc pro tunc*," notwithstanding the intervening statute that barred this relief. 12 F.3d at 667-68. In *Batanic*, the BIA ordered a new hearing because Batanic had been denied his right to counsel at his hearing before the IJ. *Id.* at 664. But before the new hearing, Congress passed the Immigration Act of 1990, Pub. L. No. 101-649, making Batanic ineligible for asylum

due to his aggravated felony conviction. *Id.* The IJ and BIA relied on the new statute and denied Batanic's application. We reversed. *See id.* at 668. Because the procedural defect caused him to lose an opportunity for statutory relief, a new hearing could not cure the defect. *Id.* at 667. We concluded that this amounted to a due process violation and granted *nunc pro tunc* relief. *See id.* at 668; *cf. Tamas-Mercea v. Reno*, 222 F.3d 417, 427 (7th Cir. 2000) (finding no *Batanic*-style due process violation where "there was no evidence that a procedural defect worked to deprive Mr. Tamas of a specific statutory right.").

In *Batanic*, we used the approach set forth in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844-45 (1984), to determine what deference to give to the BIA's retroactive application of the statute. *See* 12 F.3d at 665-66. The following year, the Supreme Court decided *Landgraf*, which now dictates our approach to determining a statute's retroactive effect. Despite this shift, the considerations under the two frameworks are similar. In *Batanic*, our first inquiry was to discern whether Congress had clearly spoken. *See id.* at 665. We "search[ed] for a congressional directive on how the amended asylum statute is to be applied in a situation in which a person would have had the benefit of prior law but for a procedural error that occurred before to the effective date of the 1990 Amendments"—but we found none. *Id.* Under *Landgraf*, we ask virtually the same question and similarly find no congressional directive. In *Batanic*, under the second step of *Chevron*, we concluded that the BIA's interpretation was not reasonable. *Id.* at 665-66. We based this determination on

the BIA's lack of analysis and inconsistent approach, as well as due process concerns. *Id.* at 666. In the present case, under the second step in *Landgraf*, we conclude that the AAO erred by giving the statutory provision an impermissible retroactive effect. We base this decision on the fact that it impairs rights that Siddiqui possessed when he had applied for legalization and rights that he would have exercised but for the agency's wrongdoing. We are also persuaded here, as we were in *Batanic*, by the AAO's lack of analysis, DHS's inconsistent interpretation, and the due process concerns. Thus, our holding in *Batanic* remains persuasive and informs our analysis.

In arguing that IIRIRA's definition of conviction applies to Siddiqui, the government relies heavily on *Moosa v. INS*, 171 F.3d 994 (5th Cir. 1999). In that case, the legalization director denied Moosa's application in 1992 because Moosa had pleaded guilty to child molestation. *Id.* at 1002. However, Moosa had received a deferred adjudication, which should have meant that his offense did not qualify as a "conviction" under then-existing laws. *Id.* at 1000-02. This error was not rectified by the Legalization Authorization Unit ("LAU," now known as the AAO) because the LAU erroneously denied Moosa's appeal as untimely. *Id.* at 1002. By the time INS discovered this mistake and remanded, Congress had enacted IIRIRA. *Id.* The LAU applied section 322 and denied the application. *Id.* Moosa argued that applying the new definition to him raised retroactivity concerns by increasing his liability for past conduct. *Id.* at 1009. The Fifth Circuit rejected this argument, concluding that

the language of section 322 was clear and that Moosa had not reasonably relied on pre-IIRIRA law because the governing standard when he pleaded guilty actually interpreted his offense as a conviction. *Id.* The court refused to "second-guess [the] policy choices properly made by the legislative branch." *Id.*

We decline to reach the same conclusion as the Fifth Circuit regarding Congress's directive. We agree that the plain language of section 322(c) demonstrates Congress's intent that the definition be applied retroactively, but we believe that the first prong of *Landgraf* counsels us to consider a narrower and more nuanced inquiry. We do not read the generic language in section 322 as conveying with "unmistakable clarity" that Congress intended to apply the new definition to applicants who, contrary to Congress's intent in 8 U.S.C. § 1255a(a)(3)(B), were prevented from applying for legalization. Furthermore, the specific circumstances here differ significantly from *Moosa*, where the petitioner failed to establish any affirmative misconduct on the part of the agency. *See* 171 F.3d at 1004-05. Siddiqui belongs to the *CSS* class, which was granted relief after eighteen years of litigation involving INS's unlawful practice of front-desking applications. This practice prevented adjudication of Siddiqui's legalization application under pre-IIRIRA law. The due process concerns that we find present in Siddiqui's case (and similar to those we found in *Batanic)* did not confront the Fifth Circuit in *Moosa*.

Because we conclude that Congress did not express its clear intent to apply IIRIRA's definition of "conviction"

retroactively to individuals such as Siddiqui, we hold that government is bound by the terms of the *CSS* settlement and must apply pre-IIRIRA law.[9]

## C. Failure to Stay or Terminate Deportation Proceedings

Lastly, Siddiqui argues that his deportation proceedings should have been stayed or terminated as a result of his pending applications for amnesty. We do not reach this issue for we hold that Siddiqui is entitled to review of his amnesty applications.[10] If Siddiqui prevails before the AAO on remand and legalization is granted, his "final order of exclusion, deportation, or removal shall be deemed canceled as of the date of the approval." 8 C.F.R. § 245a.20(e)(1) (LIFE Act).[11] If Siddiqui does not prevail on remand, his argument about the

---

[9] Because we require the AAO to adjudicate the applications under pre-IIRIRA law, we do not address Siddiqui's alternative arguments that his offense does not qualify as a conviction under IIRIRA and that retroactive application constitutes an equal protection violation.

[10] The government argues that res judicata, arising from the Sixth Circuit's review, bars Siddiqui from making this argument. Because we do not consider Siddiqui's argument, we need not address the government's counter-argument.

[11] Siddiqui asserts, without citation, that this regulation also represents a codification of "longstanding agency practice in IRCA/*CSS* claims." We need not reach the underdeveloped issue because it is sufficient that his LIFE Act application has this effect.

BIA's failure to stay or terminate his proceedings will also fail because Siddiqui cannot establish any prejudice that this caused him. As a consequence of our vacation of the BIA's decision and our instructions to the AAO, Siddiqui now has the opportunity to relitigate his legalization decisions.

Because we conclude that the AAO abused its discretion, we grant Siddiqui's petition for review and vacate the BIA's order of removal. Siddiqui may return to the AAO for a reconsideration of his legalization applications involving an individualized analysis of the evidence presented.

### III.  Conclusion

For the foregoing reasons, we GRANT Siddiqui's petition, VACATE the BIA's deportation order, and REMAND for further proceedings consistent with this opinion.